THE HONORABLE JUDGE JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| N.C., individually and on behalf of A.C., a minor,<br><br>                Plaintiff,<br><br>v.<br><br>PREMERA BLUE CROSS,<br><br>Defendant. | Case No. 2:21-cv-01257-JHC<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Noted for Consideration:<br>July 29, 2022<br><br>**ORAL ARGUMENT REQUESTED** |

**BRIAN S. KING, ATTORNEY AT LAW**
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

## **INTRODUCTION**

Plaintiff N.C. moves for Summary Judgment. Premera Blue Cross erred when it denied coverage for A.C.'s medically necessary residential treatment. A.C.'s need for intensive mental health treatment was well documented and longstanding. Had A.C.'s mother not sought treatment when she did, A.C.'s safety, indeed his life was at risk.

A.C. suffered from multiple mental health diagnoses that resulted in serous behavioral problems requiring therapeutic intervention. As A.C. entered adolescence his extraordinary mental health needs worsened to a point where, at times, police were called and A.C. was ultimately hospitalized.

For years before his hospitalization A.C. engaged in lower levels of therapy but they were not successful. Upon discharge from the hospital, A.C. participated in a wilderness program where he made significant strides. Despite his progress, A.C.'s treating clinicians remained concerned about A.C.'s symptoms and functionality and concluded A.C. was not yet prepared to return home and remain safe if he were to receive an outpatient level of care. N.C. followed the recommendations of A.C.'s treating clinicians and A.C. was admitted to Change Academy Lake of the Ozarks ("CALO") a residential treatment center. Premera authorized the first nine days at CALO, but then denied further coverage claiming that A.C. was not continuing to demonstrate serious dysfunctional behaviors while he was in treatment and CALO was no longer medically necessary. Premera's denial of continuing coverage at CALO violated the terms of the Policy and ERISA. N.C. is entitled to an Order that Premera cover the benefits that it wrongly denied.

In addition to the wrongly denied claims, Premera also violated the federal Mental Health Parity and Addiction Equity Act ("MHPAEA"). This federal legislation was designed to end

**BRIAN S. KING,** ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739 Fax (801)532-1936

discriminatory practices by insurers against mental health and substance use disorder claims as compared to analogous medical/surgical claims.

**UNDISPUTED MATERIAL FACTS**

**Parties, Jurisdiction and Venue**

1. N.C. and A.C. residing in Middlesex County, Massachusetts. N.C. is A.C.'s mother. ECF Doc. No. 2 ("Complaint"), ¶1; ECF Doc. No. 46, ("Answer") ¶1.

2. Premera was the insurer and claims administrator, and fiduciary for the insurance policy providing coverage for the Plaintiffs ("the Policy") during the treatment at issue in this case. *Id.* at ¶ 2.

3. The Policy is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). *Id.* at ¶ 3.

4. N.C. was a participant in the Policy and A.C. was a beneficiary of the Plan at all relevant times. N.C. and A.C. continue to be participants and beneficiaries of the Policy. *Id.* ¶3.

5. A.C. received medical care and treatment at CALO from June 18, 2019, to August 23, 2020. *Id.* at 4, Rec. 1965, 3619.

6. CALO is a licensed and accredited residential treatment facility in Missouri, which provides inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. Rec. 789, 822.

7. CALO specializes in the treatment of individuals suffering from Reactive Attachment Disorder, including Dyadic Developmental Psychotherapy. Rec. 20, 109, 788, 822.

8. Premera denied claims for payment of A.C.'s medical expenses in connection with his treatment at CALO. Answer ¶ 6; Rec. 1669-1175, 1801-1802, 4249.

/

**BRIAN S. KING**, ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

## The Terms of the Policy

9.  The Record includes Premera's Benefit booklet ("SPD") that describes medical/surgical

    and mental health benefits that are covered under the Policy. Rec. 5865-5954.

10. The Policy covers medically necessary services and defines those services as:

    [S]ervices and supplies that a Physician, exercising prudent clinical judgment, would
    provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an
    illness, injury, disease or its symptoms, and that are: These services must be:

    - In accordance with generally accepted standards of medical practice;

    - Clinically appropriate in terms of type, frequency, extent, site and duration, and
      considered effective for the patient's illness, injury or disease; and
    - Not primarily for the convenience of the patient, physician, or other health care
      provider, and not more costly than an alternative service or sequence of services
      at least as likely to produce equivalent therapeutic or diagnostic results as to the
      diagnosis or treatment of that patient's illness, injury or disease.

    For these purposes, "generally accepted standards of medical practice" means standards
    that are based on credible scientific evidence published in peer reviewed medical
    literature. This published evidence is recognized by the relevant medical community,
    physician specialty society recommendations and the views of doctors practicing in
    relevant clinical areas and any other relevant factors.   Rec 5949.

## A.C.'s Developmental History and Medical Background

11. A.C. was adopted by N.C. when he was a little over a year old. Rec. 23, 994-995. A.C.

    suffered from severe anxiety and had difficulty making and keeping friends. Rec. 23. He

    was bullied by his peers. *Id*. A.C.'s older sister was adopted from Cambodia and had

    serious behavioral problems and was frequently verbally and physically aggressive. *Id*.

12. A.C. had an older friend who he would visit several times throughout the year. This

    friend would often sexually abuse A.C. Rec. 24. As A.C. grew older he began to lash out

    and behave more aggressively, especially when it came to his older sister. Rec. 24.

13. During one anger-filled tantrum, A.C. refused to calm down and started throwing

    everything he could get him hands on, forcing N.C. to call the police. Rec. 24-25.

BRIAN S. KING, ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

14. A.C. frequently stated that he was suicidal and on one occasion he called the police and asked to be taken to the hospital because he didn't feel safe. Rec. 25.

15. His mother was advised that a short-term program would not likely benefit A.C. given his history and the nature of his trauma. Rec. 25-26.

16. A.C. obsessed over animals and had a distorted sense of reality and often perceived everyone to be against him. Rec. 26-27.

17. A.C. saw a variety of therapists and a psychiatrist but none of them seemed effective. His long-term psychiatrist described A.C. as "the most unreasonable person" he had ever met. Rec. 27-28, 769, 771, 774.

18. N.C. talked with A.C. about attending a short-term inpatient program but he became extremely upset, started throwing things, and attempted to punch her. Rec. 28.

19. N.C. called for an ambulance and A.C. was hospitalized from April 4, 2019, to April 18, 2019. Rec. 28, 1004-1019.

20. A.C. was then admitted to New Vision, a therapeutic wilderness program, from April 19, 2019 through June 17, 2019 before being transferred to CALO. Answer ¶ 15, Rec.1022.

21. Upon discharge, the treatment team at New Vision recommended that A.C. "continue long-term therapeutic placement to continue therapeutic support within his relationships with his family and peers." Rec. 1026.

**History at CALO**

22. A.C. was admitted to CALO on June 18, 2019. Rec. 778.

23. Premera determined that A.C.'s treatment was medically necessary and authorized coverage from June 18, 2019 through June 26, 2019. Rec. 5992.

PLAINTIFF'S MOTION FOR
SUMMARY JUDMENT - Page 5

BRIAN S. KING, ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739 Fax (801)532-1936

24. Upon admission CALO prepared an initial treatment plan that identified the following preliminary diagnoses:

    a.   Major depressive disorder, recurrent, mild,
    b.   Attention-deficit hyperactivity disorder, predominantly inattentive type,
    c.   Reactive Attachment Disorder, and
    d.   Posttraumatic stress disorder.     Rec. 778

25. Throughout his treatment, CALO reviewed and updated A.C.'s treatment plan. Rec. 358-363, 119-1125, 424-429, 3565-3570.

26. The updated treatment plans included goals and objectives for Adam's treatment. *Id.*

27. Various family therapy notes identified progress with A.C.'s ongoing issues with anxiety, fear, and anger related to A.C.'s relationships with his mother and sister. Rec. 152-153, 172, 278, 320, 322.

28. The latest treatment plan in the Record is dated May 22, 2020. The treatment plan continued A.C.'s diagnoses for Major Depressive Disorder, ADHD, and Reactive Attachment Disorder. Rec. 3565-3570.

29. This treatment plan identified goals to remedy three problem areas: Attachment/Healthy Relationships, Trauma, and Affect. Resolution. *Id.*

30. Adam received psychiatric medication management from Dr. Jyotsna Nair, MD while at CALO. Rec. 146-148, 297-301 326-328, 384-386, 3577-3579.

31. A.C. was discharged from CALO on August 23, 2020. Rec. 1965.

32. In a letter dated September 3, 2019, Premera denied payment for A.C.'s treatment. The letter gave the following justification for the denial:

> The treatment guidelines we use state that continued residential treatment for a mental health condition is medically necessary when, because of a serious emotional disturbance, the following situations are true for you:
> - Within the last week, one of these is true for you:

BRIAN S. KING, ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739 Fax (801)532-1936

● You have been having angry outbursts
● You have hurt or tried to hurt others or have thoughts about killing others
● You have hurt yourself or have thoughts about killing yourself
● You have destroyed property, or you have other very serious psychiatric symptoms.

- OR, your symptoms have improved, discharge is planned within the next week, and either some treatment goals have not been met that will be met within the next week, or more work is needed with your family before you go home that will be done within the next week.

AND within the last week, one of these is also true for you:
- You have very bad relationships with other people
- You are interacting with others in very angry or threatening ways
- You can't or won't follow instructions or ask for help to get your needs met
- OR, your functioning has improved, discharge is planned within the next week, and passes are planned within the next week to help you get ready to go to another level of care.

Continued residential treatment for a mental health condition is denied as not medically necessary after 6/26/19. Information from your provider does not show any of the situations above on and after 6/26/19.

The treatment guidelines we use also state that, in addition to other requirements, continued residential treatment for a mental health condition is medically necessary only when a psychiatric evaluation was done within one business day of admission, and is then being done at least one time per week (every 7 days), by a psychiatrist, psychiatric nurse practitioner, or psychiatric physician assistant, and when an individualized goal-directed treatment plan is completed within 1 week after admission. The information from your provider does not show any psychiatric evaluations by a psychiatrist, psychiatric nurse practitioner, or psychiatric physician assistant, after 6/26/19, and shows that the first treatment plan was not completed until more than 6 weeks after admission.

Rec. 1669-1670.

33. On February 19, 2020, N.C. submitted a level one appeal letter of the denial of payment for the denial of payment for A.C.'s treatment. Rec. 12-34.

34. NC. included medical records to document A.C.'s medical history and treatment while at CALO. Rec. 59-822, 980-1497.

35. N.C. asked that Premera comply with ERISA requirements, including its responsibility to take into account all of the information she provided, to use appropriately qualified

BRIAN S. KING, ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

reviewers and disclose their identities, to give her the information necessary to perfect the claim, to act in her best interest, and to provide her with a full, fair, and thorough review of the denial. Rec. 14.

36. N.C. pointed out that nothing in the denial letter indicated whether Premera had authorized any of A.C.'s treatment and it appeared that Premera was only denying payment for treatment rendered after June 26, 2019. N.C. asked Premera to resolve this discrepancy and to let her know immediately if it had approved the initial portion of A.C.'s treatment. Rec. 14.

37. N.C. verbally requested a copy of the criteria used to evaluate the claim but the Premera representative refused to provide it. The representative stated that this information was available on the InterQual website, but N.C. stated that this was not the case as the criteria were proprietary and not freely available. Rec. 15-16.

38. The Premera representative referred N.C. to criteria which had not been mentioned in the actual denial letter. N.C. wrote that Premera's actions significantly hindered her ability to effectively appeal the denial. Rec. 15-16

39. In response to Premera's claim that A.C. was not seen sufficiently by a psychiatrist to qualify for coverage, N.C. wrote that her insurance policy any licensed or certified facility met the definition of a "Provider" so long as it was acting in within the scope of its license. Rec. 17, 784-785.

40. N.C. asserted that CALO was a licensed and accredited residential treatment facility that satisfied Premera's intensity of service requirements. Rec. 17-18, 788, 822

41. Premera's denial rationale and criteria violated generally accepted standards of medical in that Premera identified factors such as a danger to self or others and similar acute level

BRIAN S. KING, ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

symptoms to deny payment for subacute care. Rec. 18-20, 1669-1671, 1801, 1998-2000, 4245-4247, 4249-4250.

42. N.C. asked Premera to rely on the definition of medical necessity identified in her insurance policy rather than proprietary guidelines. Rec. 21.

43. N.C. argued that Premera had failed to consider other factors as well, such as the complexity of A.C.'s mental health conditions and the fact that he was receiving residential treatment care because other interventions had failed, and it was recommended by his treatment team. Rec. 20-21.

44. Premera's acute inpatient hospitalization criteria and residential treatment criteria and both include delusions, disorganized thoughts, speech or behavior; runaway, or hallucinations as behavioral examples to qualify for admission. Rec. 18-19.

45. N.C. asserted that Premera had violated MHPAEA by imposing stricter requirements on mental healthcare than it imposed on analogous medical or surgical facilities. Rec. 22-23 Premera did not dispute this claim in its denial letter. Rec. 1801-1803.

46. N.C. identified skilled nursing care as one of the medical or surgical analogues to the residential treatment A.C. received and argued that Premera did not require its insureds to exhibit acute level symptoms for its skilled nursing services to be approved but it had placed such a requirement on A.C.'s mental healthcare. Rec. 18-20.

47. N.C. requested that Premera perform a parity analysis to determine whether or not the Policy was truly in compliance with MHPAEA. Rec. 22-23. N.C. also asked to be provided with a copy of the results of this analysis as well as any and all documentation used as required by MHPAEA. Rec. 22-23.

BRIAN S. KING, ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

48. N.C. included letters from treating providers to support the medical necessity of A.C.'s treatment at CALO:

Emily Buck, PMHNP-BC wrote in a letter dated February 7, 2020:

> …During the course of his treatment, I managed [A.C.]'s psychiatric medications, provided diagnostic assessment, and worked with [A.C.], his mother, and his treatment team in developing a safe discharge plan for [A.C.]. During family meetings with his mother, we discussed the potential benefits of a therapeutic residential program for [A.C.]. Rec. 769.

Marcus Favero, MD, A.C., psychiatrist for two year until April 2019 wrote in a letter dated February 3, 2020:

> …[A.C.] was challenging to treat due to his hostility, distrust and inability to tolerate discussion about his functional difficulties and psychiatric symptoms. Trials of several different antidepressants, mood stabilizers and stimulants (for ADHD) appeared to be only marginally helpful. In the last several months in which he was my patient, he dropped out of outpatient psychotherapy and started refusing to see me as well. …

> …[A.C.]'s mother kept in close contact with me during the early spring of 2019 as his condition continued to deteriorate. I recommended she work towards hospitalization for shorter-term stabilization, and I consulted to Emily Buck, PMHNP-BC, the psychiatric nurse practitioner in charge of his care during his hospitalization at Franciscan Children's Hospital in April 2019. My assessment at that time was that neither outpatient nor short term acute treatment were sufficient to meet his needs. Due to his chronic and deteriorating symptom picture, increasing dysfunction at school and home, hostility and/or complete withdrawal in relationships, and concerns related to his and others' safety, **I concluded that he met medical necessity criteria for long term residential treatment and recommended this course be pursued**. … Rec. 771 (emphasis added)

Amber Haines, LICSW, A.C.'s therapist wrote in a letter dated February 12, 2020,

> …[A.C.] entered treatment with myself due to several attempts with previous therapists that were not successful in engaging him in therapy. His mother sought myself out due to my background in collaborative treatment with children and adolescents and trained experience in evidence-based trauma work…

> During outpatient treatment [A.C.] presented with Post Traumatic Stress Disorder and had active symptoms that made life functioning very difficult. His symptoms interrupted healthy relationships in the family, school and community environment. He presented with aggressive behaviors, provocative behavior and language and periods of unsafe feelings. Due to the trauma history and attachment problems he was unable to engage in effective outpatient therapy and became resistant and combative in treatment. He was unable to receive and accept recommendations and responded by impulsively refusing to engage in continued

BRIAN S. KING, ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

therapy therefore therapy ended abruptly and against the recommendation of myself and his mother. … Rec. 774.

49. A.C.'s treating professionals confirmed that his treatment was medically necessary and expressed concern that Premera was disregarding the opinions of the "highly-trained clinical professionals who worked with [A.C.] on a first-hand basis." She asked Premera to elaborate on what basis it disagreed with A.C.'s providers. Rec. 33.

50. N.C. included documents from friends better explain the situation at home.  In a letter dated February 11, 2020, family friend Martha Levinson wrote:

> …[N.C.] has raised two adopted, traumatized children as a single mother and the journey has been harsh. She has employed every tool she could possibly think of and access to provide them with the help they needed. Despite this continuing effort, and especially as he has matured physically and gained physical strength, [A.C.]'s behavior just before his hospital commitment and move into CALO, had devolved to the point where [N.C.] was sometimes not safe with her own son. … Rec. 765

51. Family friend and social worker Susan Johnson wrote in a letter dated February 11, 2020:

> …As [A.C.] entered full blown adolescence his depression and post trauma issues began to interfere with his school attendance and relationship with his mom and with me. He started refusing to attend school and do his school work. He would no longer go out with me often telling me to leave early.
> . . .
> My observations of his behaviors was that he was at times suicidal as well as unable to control his rage at his mom, sister and any one he perceived posed a threat…. Rec. 767.

52. N.C. asked that Premera provide her with the specific reasoning for any denial and any corresponding supporting evidence, along with any administrative service agreements, clinical guidelines or criteria used to evaluate the claim, any mental health, substance use, skilled nursing, inpatient rehabilitation, or hospice criteria used to administer the Policy, as well as any reports or opinions from any physician or other professional regarding the claim. (collectively the "Policy Documents") Rec. 34.

BRIAN S. KING, ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

53. Premera initially failed to process this appeal, leading N.C. to file a complaint with the State of Washington's Office of the Insurance Commissioner. Following this complaint, Premera claimed it could not verify it ever received the appeal because of an error in the address, but it would allow the Plaintiffs to resubmit the appeal and Premera would process it. Rec. 4254-4255.

54. In a letter dated July 29, 2020, Premera upheld the denial of payment for A.C.'s treatment. Rec. 1801-1803, Complaint ¶33, Answer, ¶33.

55. The AllMed reviewer chose six treatment dates between June 27, 2019, and October 30, 2019, to comment on and noted A.C.'s lack of suicidal ideation, homicidal ideation and hallucinations. Rec. 1998-2000.

56. The letter then asked the reviewer to address in layman's terms why the request was denied, "*addressing each argument that the claimant raised, if any.*" The response was:

> As of June 27, 2019, [A.C.] was not wanting to harm himself or others. He was able to care for his daily needs and was not hearing or seeing things that were not there. [A.C.] was participating in treatment and did not have any severe depressive symptoms that required around the clock nursing supervision. [A.C.] could have been safely managed in a less restricted setting. Therefore, the claims for services after this date are denied. Rec. 2000.

57. The reviewer wrote in part:

> The patient is diagnosed with Major depressive disorder, recurrent, mild, Anxiety disorder, unspecified, and Attention-deficit hyperactivity disorder, predominantly inattentive type. As of 6/27/19 the patient was not reported to be suicidal, homicidal, or gravely impaired for self-care. There was no report of self-harm. He was not actively aggressive. The patient was able to care for his daily needs. He did not report any auditory or visual hallucinations. The patient was compliant with treatment and was attending family and individual therapy sessions. The patient continued to make progress to the point that could have allowed him to be treated in a lower level of care. He was not psychotic, delusional, or manic. He did not have any severe depressive symptoms that required 24-hour nursing supervision. From the clinical evidence, the patient could have been treated in a lower level of care such as partial hospitalization. Rec. 2001.

BRIAN S. KING, ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

58. On August 27, 2020, N.C. submitted a level two appeal of the denial of payment. Rec. 1965-1982.

59. N.C. noted that Premera had failed to comply with its obligations under ERISA and had not addressed the arguments she raised in the appeal process including the lack of compliance with MHPAEA that she had alleged, asking that in its subsequent review Premera correct these deficiencies. Rec. 1966-1968.

60. Premera's criteria for skilled nursing facilities demonstrate that it did not require acute symptoms to qualify for subacute care. Rec. 1969, 2017-2019.

61. N.C. again asked Premera to perform a MHPAEA compliance analysis and to provide her with a copy of the results as MHPAEA rules provide. Rec. 1969, 2005-2015.

62. The Record does not reflect that Premera provided this analysis. Rec. *passim.*

63. In a letter dated September 21, 2020, Premera upheld the denial of payment for A.C.'s treatment. The letter gave the following justification for the denial:

> Your request was denied based on a review of the clinical information submitted. [A.C.] does not meet medical necessity criteria for residential level of care from 6/27/2019 forward. [A.C.] has no dangerous psychiatric behaviors, comorbid medical problems, withdrawal symptoms or other gross dysfunction that would necessitate this level of care. It appears that he could be cared for at a lower level of care during this time. Kupfer and colleagues as well as Davidson highlight treatment options for major depression and it appears that these could be utilized at a lower level of care in this case from the above-mentioned dates forward. Rec. 4249, Answer, ¶41

64. When asked to give a justification for the denial in layperson's terms, again "*addressing each argument that the claimant raised*"[1] The reviewers wrote:

> You do not meet criteria for residential level of care from 6/27/2019 forward. **You do not have any active plans to end your life or others**. You do not have any medical problems. You are not withdrawing from drugs. As such, the request is not approved. Rec. 4246 (emphasis added).

---

[1] Emphasis in original

BRIAN S. KING, ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

65. Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Policy and ERISA. Rec. 4249-4250, 5938-5940.

## ARGUMENT

## STANDARD OF REVIEW

This case presents two distinct causes of action. First, Premera is responsible to cover A.C.'s treatment costs because Premera wrongly denied benefits according to the terms of the Policy.[2] Second, Premera violated MHPAEA and N.C. and A.C. are entitled to equitable remedies.[3] Both claims must be reviewed under a *de novo* standard of review.

As it relates to the first cause of action, the Supreme Court,[4] holds that the default standard of review is *de novo* unless the terms of the ERISA policy give notice to participants and beneficiaries that the policy administrator intends to retain discretionary authority to interpret the terms of the policy and determine eligibility for benefits. The default standard of review in ERISA claims is therefore *de novo* and "the administrator has to show that the plan gives it discretionary authority in order to get any judicial deference to its decision."[5] There is no such language here. Nor can there be since the State of Washington expressly bans discretionary authority clauses for policy's like Premera's.[6] This regulation prohibits "deference" to the "insurer's interpretation" and mandates a "de novo review."[7] In *Standard Ins. v. Morrison,* the Ninth Circuit has held that ERISA does not preempt state laws banning discretionary clauses.[8] Consequently, Premera's decision to deny benefits is subject to *de novo* review.

---

[2] Complaint, ¶¶46-53 , *See also* 29 U.S.C. § 1132 (a)(1)(B).
[3] Complaint, ¶¶, 54-72, *See also* 29 U.S.C. § 1132 (a)(3).
[4] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).
[5] *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir. 1999); *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 707 (9th Cir. 2012).
[6] Wash. Admin. Code § 284-44-015 (2022).
[7] *Id.*
[8] *Standard Ins. Co. v. Morrison*, 584 F.3d 837, 849 (9th Cir. 2009).

BRIAN S. KING, ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

As it relates to MHPAEA causes of action, courts have applied a *de novo* standard of review. "The interpretation of [] a federal statute, is a question of law subject to de novo review."[9] In *Beckstead v. EG&G Tech. Servs. Emple. Benefit Plan*,[10] the court expounded the proposition that "the determination of a Plan Administrator's compliance with ERISA's statutes and regulations is one of statutory interpretation in which the Court owes the Plan Administrator no deference."[11] And courts in other jurisdictions have applied this same reasoning to MHPAEA claims. "Unlike the denial of benefits claim, the court affords Defendants no deference in interpreting the [MHPAEA] because the interpretation of a statute is a legal question."[12] Consequently, Plaintiffs' MHPAEA claim is reviewed under the *de novo* standard of review.

For the denied benefits claim, when "a court reviews the administrator's decision, whether de novo . . . , or for abuse of discretion, the record that was before the administrator furnishes the primary basis for review."[13] Because Premera's compliance with MHPAEA was not for Premera to decide during the prelitigation appeal process the Court is not limited to the documents created during the prelitigation appeal process. In this instance, Premera has included documents including medical/surgical guidelines in the same Record that was provided to Plaintiffs and will be filed with the Court.[14]

//

//

---

[9] *Long v. Flying Tiger Line, Inc.*, 994 F.2d 692, 694 (9th Cir. 1993).
[10] 2006 U.S. Dist. LEXIS 86158, at *8 (D. Utah Nov. 14, 2006).
[11] *Id.* at *8 (citing *Chiles v. Ceridian Corp.,* 95 F.3d 1505, 1511 (10th Cir. 1996)
[12] *Christine S. v. Blue Cross Blue Shield of N.M.*, No. 2:18-cv-00874-JNP-DBP, 2021 U.S. Dist. LEXIS 199330, at *10 (D. Utah Oct. 14, 2021) (citing *Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1258 (D. Utah 2016) (citing *Foster v. PPG Indus. Inc.*, 693 F.3d 1226, 1233 (10th Cir. 2012)).
[13] *Id.* at 1090.
[14] Rec. 1699-1793, 6036-6227.

**BRIAN S. KING, ATTORNEY AT LAW**
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

**I. A.C. IS ENTITLED TO COVERAGE OF HIS SERVICES AT CALO CONSISTENT WITH THE TERMS OF THE POLICY AND ERISA.**

Prior to entering inpatient treatment A.C. had multiple mental health conditions and problematic behaviors that had led to ever increasing levels of care.[15] From 2016 until 2018. A.C. engaged in outpatient counseling but his behavioral challenges did not resolve.[16] In fact, when treated at lower levels of care, A.C. symptoms intensified to the point that he required an inpatient hospitalization from April 4, 2019 to April 12, 2019 to address his increasing suicidal thought and intent.[17]

Throughout his care, A.C. carried a diagnosis for Reactive Attachment Disorder.[18] According to the American Academy of Child and Adolescent Psychiatry, this diagnosis required dyadic developmental psychotherapy.[19] The Record confirms that this was the treatment modality employed by CALO.[20] Indeed the treatment plans at CALO reflect a multidisciplinary approach to address A.C.'s complex mental health needs that included individual, family, group therapy, and dyadic developmental psychotherapy along with other modalities.[21] All of these factors show that A.C.'s treating clinicians were exercising prudent clinical judgment.

The Policy covers services when a provider "exercising prudent clinical judgment" evaluates, diagnoses, or treats a patient's illness, injury, disease or its symptoms.[22] But these services must be provided in accordance with generally accepted standards of practice and be

---

[15] Rec. 23-33.
[16] Rec. Rec. 3577.
[17] Rec. 3577
[18] Rec. 424, 778, 3565.
[19] Rec. 20, 930-944.
[20] Rec. 109, 121, 131, 152, 171, 175, 186, 202, 236, 240, 251, 278, 292, 303, 337, 345, 360, 373, 378, 410, 426, 433, 450.
[21] Rec. 426
[22] Rec. 1683.

**BRIAN S. KING, ATTORNEY AT LAW**
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

clinically appropriate.[23] The service must also cost less than an alternative treatment that would provide equivalent results.[24] Finally, the Policy also requires that the services cannot be for the convenience of the patient or provider.[25]

Premera found that A.C. initially met all these requirements because it authorized coverage for the first week and a half of his care at CALO.[26] But after that short period of time, Premera denied benefits claiming that A.C. wasn't having angry outbursts, hurting or thinking about hurting others or himself, destroying property, or experiencing "serious psychiatric symptoms."[27] According to Premera, not only did A.C. need to display at least one of those symptoms, but he also had to have serious problems within the last week or be on the verge of discharge.[28] And even after a second appeal, Premera upheld its denials and stated that A.C. did not meet medical necessity requirements because he had "no dangerous psychiatric behaviors."[29] But that conclusion was based on an AllMed reviewer's statement that A.C. did not meet the Policy criteria because A.C. did "not have any active plans to end your life."[30]

In light of Premera's decision to pay for the first nine days of A.C.'s treatment at CALO, it's rationale for denial passes muster only if A.C. had experienced those symptoms during the first days of treatment. But the Record reflects that during his first days at CALO, A.C.'s behavior was nothing out of the ordinary compared to the treatment period after the time for which Premera paid. To the degree that Premera determined that A.C. would have been safe at a

---

[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] Rec. 5992
[27] Rec. 1669, 1801.
[28] Rec. 1669-1670.
[29] Rec. 4249
[30] Rec. 4246.

BRIAN S. KING, ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

lower level of care because he was not presenting with serious symptoms like threats to life of self or others or other serious harms, Premera's conclusion lacks a sufficient basis in fact. It is also inconsistent with its decision to pay for the first nine days of N.C.'s treatment at CALO.

In *Wiwel v. IBM Med. & Dental Ben. Plans for Regular Full-Time & Part-Time Emps.*,[31] the court analyzed a situation where the claimant's behavior had been unstable outside of the residential treatment center but stable within.[32] In rejecting the insurer's decision to deny benefits the court pointed out that the insurer never analyzed the influence the residential treatment center had on the patient's behavior and her ultimate safety.[33] The court faulted the insurer because "it fails entirely to address a conspicuous confounding variable, namely, the influence that [the treatment center], itself, may have brought to bear upon [the claimant]'s behavior."[34] Nowhere does Premera provide any basis to believe that in the absence of CALO's care A.C.'s behavior would not have reverted to the dysfunction he was experiencing before he went to CALO.

Furthermore this Court has found that non-acute residential treatment centers treat patients for a longer duration for patients that have not responded to lower levels of care.[35] These findings were based on peer reviewed scientific literature that showed residential treatment to be highly effective for these types of patients.[36] Because nothing in the Policy limited residential care to "acute" residential care, it was wrong for Premera to use an absence of acute symptoms to justify its denial of continuing coverage for A.C.'s care at CALO.

//

---

[31] No. 5:15-CV-504-FL, 2017 U.S. Dist. LEXIS 46377, at *11-12 (E.D.N.C. Mar. 29, 2017)
[32] *Id.* at *11-12.
[33] *Id.*
[34] *Id.*
[35] *H.N. v. Regence BlueShield*, No. 15-CV-1374 RAJ, 2016 U.S. Dist. LEXIS 178182, at *20-21 (W.D. Wash. Dec. 23, 2016)
[36] *Id.*

**BRIAN S. KING,** ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

A.C.'s initial treatment plan documented that the reasons for admission included worsening behaviors and functioning since at least 2016.[37] A.C. had problems with school and depression and had been making suicidal statements.[38] A.C.'s struggled with self-care, was irritable, and had mood instability. [39] As a result of A.C.'s behavior and problems with functionality, his psychiatrist recommended "a residential placement."[40] But Premera did not wait for A.C. to resolve the actual symptoms that resulted in his admission. Instead Premera identified symptoms that A.C. had not experienced to justify its denial.[41]

Premera's reasoning mirrors the analysis that was required for A.C. to be hospitalized and that is inconsistent with subacute care in a residential treatment center.[42] In the letter from AllMed dated July 29, 2020 the reviewer explained his justification for denial. "[Y]ou were not wanting to harm yourself or others . . .. You were not hearing or seeing things that were not there. You were participating in treatment. You did not have any severe depressive symptoms that required around the clock nursing supervision. You could have been safely managed in a less restricted setting."[43] Had these symptoms been present, they would have required acute hospital treatment, not subacute residential treatment

Generally accepted standards of medical practice for the mental health treatment of adolescents are identified by AACAP's Practice Parameters. The parameters are designed to provide clinicians with assessment and treatment recommendations for child and adolescent psychiatric disorders and with principles guiding the general and special assessment of children,

---

[37] Rec. 778.
[38] *Id.*
[39] Id.
[40] *Id.*
[41] Rec. 1669-1770, 1801-1802, 4245-4250.
[42] Rec. 19, 1701, 1702, 1722-1726.
[43] Rec. 2000

**BRIAN S. KING,** **ATTORNEY AT LAW**
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739 Fax (801)532-1936

adolescents, and their families, and the management of children and adolescents with special

mental health needs.[44] The AACAP recommends residential level of treatment in situations:

> When the treating clinician has considered less restrictive resources and determined that they are either unavailable or not appropriate for the patient's needs, it might be necessary for a child or adolescent to receive treatment in a psychiatric residential treatment center (RTC). In other cases, the patient may have already received services in a less restrictive setting and they have not been successful.[45]

But Premera failed to account for the safety that CALO provided and ignored the

recommendations of A.C.'s treating clinicians. A.C.'s treating provider at New Visions

recommended "long-term therapeutic placement."[46] Therapist Claire Vos MS, LPC, wrote:

"Although substantial gains are being made in his treatment, a return to his home setting or

another setting without a robust therapeutic program would cause significant regression and the

return of [A.C.]'s negative coping strategies."[47]

Premera also improperly denied benefits for A.C.'s claims when it applied acute criteria

to evaluate A.C.'s claims for residential treatment. It was wrong for Premera to require

"dangerous psychiatric behaviors" or "other gross dysfunction" to justify continued care.[48] Even

more problematic was the requirement that services were not covered because A.C. did "not have

any active plans to end your life or others."[49] Outside of residential treatment, A.C. behaviors

might have deteriorated to those levels, but residential treatment avoided a return to

hospitalization. Because Premera applied the wrong standard when evaluating A.C.'s claim, its

---

[44] Practice Parameters, Principles, Guidelines and Resource Centers, AACAP, available at https://tinyurl.com/bdhcf8h3 (last accessed July 7, 2022).
[45] Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers, AACAP, https://tinyurl.com/39w939j3 (last accessed July 7, 2022).
[46] Rec. 1026
[47] *Id.*
[48] Rec. 4249; *See James F. ex rel. C.F. v. Cigna Behavioral Health, Inc.*, No. 1:09CV70 DAK, 2010 U.S. Dist. LEXIS 136134, at *16 (D. Utah Dec. 23, 2010).
[49] Rec. 4246

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - Page 20

decision to deny benefits should be reversed and Premera should be required to cover A.C.'s care at CALO.

## II. CLAIM UNDER 29 U.S.C. § 1132(a)(3) FOR VIOLATING MHPAEA.

Under MHPAEA regulations, plans that offer behavioral health benefits are required to offer those benefits at parity with comparable medical/surgical benefits. Specifically, with regard to sub-acute or "intermediate" care:

> These final regulations are expected to maintain or perhaps slightly improve coverage for intermediate levels of care. These services that fall between inpatient care for acute conditions and regular outpatient care can be effective at improving outcomes for people with mental health conditions or substance use disorders.[50]

Premera violated MHPAEA in at least two ways. First, Premera improperly measured A.C. against acute or other severe symptoms that would require hospitalization before it covered residential treatment center benefits for mental health or substance use disorder claimants. In contrast, for analogous skilled nursing facility claimants, Premera does not require that the claimant exhibit acute or severe conditions before approving subacute care. This means that when claimants request coverage for skilled nursing facilities, the benefits Premera provides are more generous than the benefits it provides for residential treatment of mental health disorders. Second, Premera subjected A.C. to two levels of analysis when it only required one level of assessment to medical claimants who request coverage for inpatient hospice.

Under MHPAEA regulations, plans that offer behavioral health benefits are required to offer those benefits at parity with comparable medical/surgical benefits.

> These final regulations are expected to maintain or perhaps slightly improve coverage for intermediate levels of care. These services that fall between inpatient

---

[50] MHPAEA Final Rules, Federal Register, Vol. 78, No. 219, Rules and Regulations, 13 Nov. 2013, p. 68259.

BRIAN S. KING, ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

care for acute conditions and regular outpatient care can be effective at improving outcomes for people with mental health conditions or substance use disorders.[51]

But rather than provide coverage at parity, Premera's Policy documents, independent criteria, and heightened symptom restrictions limit coverage for intermediate levels of care for mental health and substance use disorder claims. This violates MHPAEA violation. "Congress enacted the [Parity Act] to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans."[52] "The Parity Act forbids ERISA group health plans from imposing more restrictive treatment limitations for mental health or substance use disorder benefits than for medical or surgical benefits."[53]

As to Premera's improper application of acute care criteria, the following table illustrates several ways that Premera imposed more restrictive limitations on coverage at residential treatment centers than at skilled nursing facilities ("SNF").

| Skilled Nursing Facilities | Residential Treatment Centers |
| --- | --- |
| Patient needs to actively cooperate Rec. 6169 | Patient is unable or unwilling to follow instructions, Patient unable to maintain behavioral control. Rec. 1722 |
| Functional impairment requiring at least minimum assistance. Rec. 6169<br>Can include: gait evaluation and training, transfer training, therapeutic treatment to ensure patient safety. Rec. 6169 | Functional impairment severe Rec. 1722 |
| | Symptoms must be persistent or repetitive for |

---

[51] MHPAEA Final Rules, Federal Register, Vol. 78, No. 219, Rules and Regulations, 13 Nov. 2013, p. 68259.
[52] *Michael D. v. Anthem Health Plans of Kentucky, Inc.*, 369 F. Supp. 3d 1159, 1174 (D. Utah 2019) (internal citations omitted).
[53] *K.K. v. Premera Blue Cross*, No. C21-1611-JCC, 2022 U.S. Dist. LEXIS 95710, at *4 (W.D. Wash. May 27, 2022); *See also* 29 U.S.C. § 1185a (a)(3)(A)(ii).

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - Page 22

**BRIAN S. KING, ATTORNEY AT LAW**
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

| | 6 months.[54] Rec. 1722 |
|---|---|
| Continued care ends at SNF when services are for custodial care, patient unwilling to cooperate, routine medical administration, 6169 | Continued care Requires symptom requirements like aggressive or assaultive behavior, homicidal ideation, or nonsuicidal self-injury to occur during the previous week. Rec. 1724-1726 |

Each of these items demonstrates that Premera applies more restrictive limitations to residential treatment center coverage than to analogous skilled nursing facility coverage.[55] Nothing in the Policy requires a member to present with imminent risk of harm in order to qualify for coverage at a SNF. It is the InterQual criteria for residential treatment centers that imposes this more restrictive limitation.[56] But Premera does not require acute symptomology to approve benefits for analogous medical surgical claims.[57] This violates MHPAEA. In a recent Utah case the district court held:

> . . . although the Plan purports to impose comparable limitation on treatment at RTC programs and skilled nursing facilities, in actuality [the insurer] imposed a more stringent limitation on RTC care that more closely resembled the requirement for acute inpatient mental health care. Such a disparity between the requirements for mental health coverage and medical-surgical coverage runs afoul of [MHPAEA].[58]

*Johnathan Z.* further holds that acute symptoms include "psychosis or suicidal ideation."[59]

//

---

[54] As will be discussed more fully below, because there is no analogous requirement for persistent and repetitive behavior when evaluating admission to SNFs, that fact demonstrates that Premera adds an additional hurdle to RTC claimants as compared with SNF claimants.
[55] *K.K. v. Premera Blue Cross*, No. C21-1611-JCC, 2022 U.S. Dist. LEXIS 95710, at *6 (W.D. Wash. May 27, 2022).
[56] Rec. 1722-1726.
[57] Rec. 6166-6176.
[58] Exhibit A, *Jonathan Z. et. al. v. Oxford Health Plans*, No. 2:18-cv-00383-JNP-JCB, slip op. at 41 (D. Utah, filed July 7, 2022).
[59] *Id.*

BRIAN S. KING, ATTORNEY AT LAW
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

The second MHPAEA violation is that Premera subjects residential treatment claimants to two levels of analysis when it only assesses one level of assessment to hospice claimants. This allegation is supported by a different case also involving Premera. In *M. S. v. Premera Blue Cross*,[60] the court held that Premera imposed an additional hurdle on mental health and substance use disorder benefits at residential treatment centers above and beyond the benefit requirements for inpatient hospice care, an analogous level of medical/surgical treatment.[61]

> In other words, claimants seeking medical/surgical benefits for inpatient hospice care have one less hurdle to clear. Claimants in this classification of benefits must meet one criterion to meet the medical necessity requirement: the Plan language. On the other hand, claimants seeking mental health benefits in the same classification—residential treatment centers—must satisfy both the Plan language and the additional InterQual Criteria. This makes the nonquantitative treatment limitation of medical necessity more restrictive as applied to mental health benefits. This outcome is specifically what the Parity Act was enacted to prevent. Because the additional InterQual Criteria are applied to determine whether residential treatment center benefits are medically necessary, the court concludes the treatment limitation is applied more restrictively to mental health benefits than as applied to analogous medical/surgical benefits covered by the Plan. This violates the Parity Act.[62]

The same situation occurred in this matter related to Premera and the InterQual criteria it uses. The Record contains no evidence that Premera utilizes any guidelines when assessing inpatient hospice claims. As a result, the only limitation to receiving benefits for those subacute inpatient medical benefits is the Policy's medical necessity definition. In contrast Premera presents both hurdles for residential treatment center claimants.

//

//

---

[60] 553 F., Supp. 3d 1000, 1032-1033. (D. Utah 2021)
[61] *Id.* at *52-53.
[62] *Id.*

**BRIAN S. KING, ATTORNEY AT LAW**
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936

### III. THE PLAINTIFFS ARE ENTITLED TO THE FULL REMEDIES AVAILABLE UNDER THE LAW.

In the event the Court grants Plaintiff's Motion for Summary Judgment, the Court should not remand Plaintiff's claims to Defendant. Instead, the Court should enter judgment in Plaintiffs' favor and order Defendant to pay for the treatment A.C. received at CALO. While ERISA treats plan administrators as somewhat analogous to administrative agencies during a claimant's prelitigation appeals, the text of ERISA itself "does not contain any provisions governing remands to plan administrators once those actions have been initiated, nor does it explain how judicial review of determinations made on remand is to occur."[63] This contrasts with the regulatory frameworks governing *actual* administrative agencies, and as courts have noted, runs a significant and problematic risk of creating an unfair "heads we win; tails, let's play again" system of benefits adjudication in favor of defendant insurance companies.[64]

Remanding this case to Defendant strays from the United States Constitution that prohibits federal courts from issuing advisory judicial opinions as opposed to final judgments of conclusive character on meritorious civil actions.[65] As the Supreme Court noted in *Aetna Life Insurance Co. v. Haworth*, "[w]here there is [ ] a concrete case admitting of an immediate and definitive determination of the legal rights of the parties" in the context of a civil dispute over insurance benefits, the case may be appropriately resolved by a declaratory judgment addressing the dispute.[66] However, in the event that the Court does decide to remand A.C.'s claims for a

---

[63] *Mead v. Reliastar Life Ins. Co.*, 768 F.3d 102, 112 (2nd Cir. 2014).
[64] *Tam v. First Unum Life Ins. Co.*, 2020 U.S. Dist. LEXIS 186477 (C.D. Cal. 2020) (citation and internal quotation marks omitted).
[65] *See* U.S. Const. Art. III.
[66] 300 U.S. 227, 241-44 (1937).

**BRIAN S. KING**, **ATTORNEY AT LAW**
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801) 532-1936

further review by Defendant, the Court should limit Defendant's potential bases for denial to those discussed in their denial letters in the pre-litigation appeal process.[67]

As it relates to remedies for the MHPAEA violation, Plaintiffs request the opportunity further brief the Court based on the MHPAEA violation it finds.[68]

## **CONCLUSION**

For all the foregoing reasons Plaintiff's Motion for Summary Judgment should be granted together with a corresponding order for attorney fees, costs, and prejudgment interest.

RESPECTFULLY SUBMITTED this 7th day of July 2022.

*/s/ Eleanor Hamburger*
Eleanor Hamburger, WSBA #26478
SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 Western Avenue, Suite 350
Seattle, WA 98121
Tel. (206) 223-0303
Fax (206) 223-0246
Email: ehamburger@sylaw.com

*/s/ Brian S. King*
Brian S. King, *Admitted Pro Hac Vice*
BRIAN S. KING, P.C.
420 E. South Temple, Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739
Fax (801) 532-1936
Email: brian@briansking.com

---

[67] *Carlile v. Reliance Std. Life Ins. Co.*, 988 F.3d 1217, 1229 (10th Cir. 2021); *see also Harlick v. Blue Shield of California*, 686 F.3d 699, 719 (9th Cir. 2012) (administrators are not allowed to "sandbag" plaintiffs with after-the-fact rationale).

[68] See Exhibit A at p. 43 of 44 where the court in *Johnathan Z.* ordered additional briefing.

## CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury under the laws of the State of Washington and the United States, that on the 24th day of June, 2022, the foregoing document was presented to the Clerk of the Court for filing and uploading to the Court's CM/ECF system. In accordance with the ECF registration agreement and the Court's rules, the Clerk of the Court will send email notification of this filing to all attorneys in this case.

DATED: June 24th, 2022

/s/ Brian S. King
Brian S. King, *pro hac vice*

**BRIAN S. KING, ATTORNEY AT LAW**
420 East South Temple; Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739  Fax (801)532-1936