# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| N.C., individually and on behalf of A.C., a minor,<br><br>          Plaintiff,<br><br>v.<br><br>PREMERA BLUE CROSS,<br><br>          Defendant. | Case No. 2:21-cv-01257-JHC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Note on Motion Calendar: |

## INTRODUCTION

A.C. received medically necessary care at Change Academy Lake of the Ozarks ("CALO") to address serious behavior problems caused by multiple mental health diagnoses. The challenges interfered with A.C.'s life at home and school and his behaviors placed himself and others at risk.

After paying for nine days of treatment, Defendant Premera Blue Cross ("Premera") wrongly asserts that CALO failed to document any psychiatric problems. But the Record contains a neuropsychological evaluation, treatment plans and progress notes. N.C. was diagnosed with depression, reactive attachment disorder, and posttraumatic stress disorder. He was treated by a team of providers including a psychiatrist and therapists. Rather than accept the documented evidence of the medical necessity of A.C.'s care, Defendant continues to argue that A.C. did not qualify for further benefits.

Defendant has also violated the Mental Health Parity and Addiction Equity Act ("MHPAEA") by its disparate payment for A.C.'s subacute treatment in contrast to its more generous payment of analogous medical/surgical benefits.

First, as a precondition to covering A.C.'s subacute treatment at CALO, Premera improperly measured A.C. against symptoms that would require hospitalization. In contrast, for an analogous level of care for medical/surgical benefits, skilled nursing facility care, Premera does not require that the patient exhibit acute or severe conditions before paying benefits. This means that when claimants request coverage for skilled nursing facilities, the benefits Premera provides are more generous than the benefits it provided for the residential treatment of A.C.'s mental health disorders. That is a violation of MHPAEA. Second, Premera subjected A.C. to two levels of medical necessity restrictions for his residential treatment when it only requires one level of restrictions for medical claimants who request coverage for inpatient hospice.

Plaintiff is entitled to payment for A.C.'s medically necessary care and for appropriate equitable remedies to rectify Premera's MHPAEA violations.

## ARGUMENT

### I. WASHINGTON'S BAN ON DISCRETIONARY AUTHORITY CLAUSES REQUIRES A *DE NOVO* STANDARD OF REVIEW.

Premera fails to address the ban on discretionary authority clauses in the state of Washington.[1] As a result, the language that Premera identifies as granting discretionary authority is invalid and cannot be used to obtain an arbitrary and capricious standard of review. Premera's

---

[1] Wash. Admin. Code § 284-44-015 (2022).

decision to deny benefits will be reviewed *de novo*.[2] In the event the court determines that an

arbitrary and capricious review is appropriate, Plaintiff agrees with Premera that when the same

entity that funds an insurance policy also evaluates the claims, the inherent conflict of interest

must be weighed as a factor in determining whether there was an abuse of discretion.[3]

Even if the Policy contained valid language that conferred discretionary authority, Premera lost

that benefit of a deferential review when it failed to provide a full and fair review and engage in

a meaningful dialogue with N.C. during the prelitigation appeal process.

Premera now argues that Plaintiff's claim for denied benefits fails because A.C.'s

treatment was not medically necessary and that CALO did not satisfy Premera's intensity of

service requirements. As a threshold matter, Premera cannot rely on its argument that CALO

failed to meet intensity of service requirements because it abandoned that rationale in its final

two denial letters.[4] In another case involving Premera, Premera identified an intensity of service

rationale in its initial denial letter but it failed to include that same rationale in its subsequent

denial letters.[5] In *Lyn M.*, the court held that although Premera raised the intensity of service

criteria in its initial denial, Premera had effectively abandoned the rationale throughout the rest

of the administrative appeals process. The court then held that it would be an unfair

"sandbagging" of the Plaintiffs to allow Premera to resurrect this argument long after it was

abandoned in the meaningful dialogue that is required between the provider and the insured

during the prelitigation process.[6]

---

[2] *Standard Ins. v. Morrison*, 584 F.3d 837, 849 (9th Cir. 2009).
[3] ECF Doc. 48, p. 12 of 27.
[4] Rec. 1801-1803, 4249-4251.
[5] *Lyn M. v. Premera Blue Cross*, 2021 U.S. Dist. LEXIS 230373, at *12 (D. Utah Nov. 30, 2021)
[6] *Id.*

The same is true in this case. Premera's denial letter of September 3, 2019, stated that A.C. did not meet certain treatment guidelines requiring various behavioral symptoms within the prior week.[7] The letter further identified issues regarding the intensity of service that A.C. received at CALO.[8] However, later denial letters abandoned any mention of the intensity of services argument.[9] In litigation, Premera attempts to resurrect intensity of service argument.[10]

This inconsistency runs contrary to ERISA. That statute is designed to provide a meaningful dialogue between the provider and the insured during the prelitigation appeals process.[11] *Harlick v. Blue Shield of California* holds that a plan must provide "'specific *reasons* for the denial'—not just one reason, if there was more than one—and provide a '*full* and fair review' of the denial.[12] Premera cannot use its internal logs to support its denial if the content of those logs was not communicated to the Plaintiff during the prelitigation appeal process.[13] Premera's attempt to resurrect its intensity of service arguments after abandoning them in the prelitgation appeal process is akin to the sandbagging that *Harlick* recognized and condemned.[14]

//

//

//

//

---

[7] Rec. 1669.

[8] Rec. 1670.

[9] Rec. 1801-1803, 4249-4251.

[10] Premera also improperly tries to raise a failure to pre-approve treatment. ECF Doc. 48, p. 8 of 27. That fails for the same reason.

[11] *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1462 (9th Cir. 1997).

[12] 686 F.3d 699, 720 (9th Cir. 2012) (quoting 29 U.S.C. § 1133, emphasis in original).

[13] *Foote v. Beverly Hills Hotel & Bungalows Emple. Ben. Emple. Welfare Plan*, 2021 U.S. Dist. LEXIS 251298, at *27-28 (C.D. Cal. Aug. 12, 2021)

[14] ECF Doc. 48, p. 14 of 27, *Harlick,* 686 F.3d at 720

## II. PREMERA'S ARGUMENTS FAIL TO REFUTE THE MEDICAL NECESSITY OF A.C.'S TREATMENT

Plaintiff's Motion for Summary Judgment demonstrated the medical necessity of N.C.'s care at CALO based on the terms of the Policy. However, Premera relies on the InterQual criteria to argue that A.C.'s treatment was not medically necessary.[15]

Premera's arguments are flawed for at least four fundamental reasons. First, Premera's argument ignores the requirements of medical necessity as outlined in the Policy. Second, Premera's complete reliance on the InterQual criteria violates the procedures and limitations described within its InterQual criteria. Third, Premera ignores the unrefuted recommendations of A.C.'s treating providers. Fourth, Premera's arguments show that it withholds benefits for *subacute* mental health treatment when the patient fails to exhibit *acute* symptoms. Each of these errors demonstrates why the decision to deny benefits was wrong.

### A. A.C.'s Treatment Was Medically Necessary as Defined by The Policy

First, Premera's argument ignores the requirements of medical necessity as outlined in the Policy. The Policy covers medically necessary services and defines those services as:

[S]ervices and supplies that a Physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:

- In accordance with generally accepted standards of medical practice;

- Clinically appropriate in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and

- Not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services

---

[15] ECF Doc. 48, pp. 6 and 7.

at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.[16]

Premera agrees that A.C.'s treatment was beneficial. As the InterQual criteria point out, residential treatment is recommended when an "individual cannot be managed safely in the community yet does not require the services of inpatient hospitalization."[17] N.C.'s appeal letters and the therapist notes reflect that N.C. lacked the ability to control A.C.'s behavior in a way where he and others could be safe at home. N.C. described the conflict in the home that escalated to the point that the family could not even eat meals together. When the siblings were together the result was physical violence. Indeed, the prelitigation appeal Record confirms that N.C. was unable to provide a safe environment for A.C. until he had dealt with his issues caused by his serious mental health conditions.[18]

Premera never argues, and under these circumstances cannot argue, that A.C.'s providers failed to exercise prudent judgment. Because A.C. was not safe while being treated in an outpatient setting, it was clinically appropriate to treat A.C. in a residential setting until he resolved the issues that placed him and others at risk. CALO's records documented that A.C. carried a diagnosis for Reactive Attachment Disorder.[19] Consistent with the American Academy of Child and Adolescent Psychiatry, this diagnosis required dyadic developmental psychotherapy.[20] The Record confirms that this was the treatment modality CALO utilized.[21] Indeed the treatment plans at CALO reflect multiple treatment modalities employed to address

---

[16] Rec. 5949
[17] ECF Doc. 48, p. 15 of 27
[18] Rec. 12-34, 1965-1982.
[19] Rec. 424, 778, 3565.
[20] Rec. 20, 930-944.
[21] Rec. 109, 121, 131, 152, 171, 175, 186, 202, 236, 240, 251, 278, 292, 303, 337, 345, 360, 373, 378, 410, 426, 433, 450.

A.C.'s complex mental health needs that included individual, family, group therapy, and dyadic developmental psychotherapy and other modalities.[22]

A.C. met all the requirements for medical necessity as defined by the Policy and Premera should have covered his care. His treatment was consistent with clinical prudent judgment, followed generally accepted practices, and properly continued until A.C. resolved his issues to the degree that he could be safely treated in a lower level of care.

Nevertheless, Premera argues that because A.C. did not express suicidal intentions during his stay at CALO that his treatment was not medically necessary.[23] This is a red herring because suicidality is only one of numerous symptoms included in the required conditions for coverage under the InterQual criteria that Premera argues applied to A.C.'s coverage.[24] Furthermore, suicidality is more in line with InterQual's inpatient hospitalization criteria than it aligns with the criteria for subacute residential treatment.[25] In light of Premera's decision to pay for the first nine days of A.C.'s treatment at CALO, its rationale for denial after that time passes muster only if A.C. had experienced those symptoms during the first days of treatment.

Based on its denial letters, Premera denied benefits because A.C. wasn't

- having angry outbursts, hurting or thinking about hurting others or himself,
- destroying property, or
- experiencing "serious psychiatric symptoms."[26]

//

//

---

[22] Rec. 426.
[23] ECF Doc. 48, p. 5, 6.
[24] Rec. 1722-1726.
[25] Rec. 1701-1712.
[26] Rec. 1669, 1801.

According to Premera, not only did A.C. need to display at least one of those symptoms, but he also had to have serious problems within the last week or be on the verge of discharge.[27] Even after a second appeal, Premera upheld its denials and stated that A.C. did not meet medical necessity requirements because he had "no dangerous psychiatric behaviors."[28] That conclusion was based on an AllMed reviewer's statement that A.C. did not meet the Policy criteria because A.C. did "not have any active plans to end your life."[29]

But the Record reflects that during his first days at CALO, A.C. did not experience those types of behaviors. The progress notes indicated that A.C. showed verbal aggression through profanity.[30] His therapist reported that A.C. was adjusting to treatment and he was ignoring the issues he had with a couple of peers.[31] But generally the record indicates that A.C.'s initial behavior was nothing out of the ordinary compared to the treatment period after the time for which Premera paid.[32] To the degree that Premera determined that A.C. would have been safe at a lower level of care because he was not presenting with serious symptoms like threats to life of self or others or other serious harms, Premera's conclusion lacks a sufficient basis in fact because it agreed to pay for the first nine days of A.C.'s treatment at CALO, and A.C. was not demonstrating those symptoms at that point.

**B. InterQual's Own Instructions Require it be Used Only as a Screening Tool and Not as the Sole Basis to Deny Benefits.**

Premera's complete reliance on the InterQual criteria violates the procedures contained within the InterQual criteria themselves. The InterQual instructions provide:

---

[27] Rec. 1669-1670.
[28] Rec. 4249.
[29] Rec. 4246.
[30] Rec. 3162-3164.
[31] Rec. 3156-3158.
[32] Rec. 3148-3196.

The criteria reflect clinical interpretations and analyses and cannot alone either resolve medical ambiguities of particular situations or provide the sole basis for definitive decisions. **The criteria are intended solely for use as screening guidelines** with respect to the medical appropriateness of health care services and **not for final clinical or payment determinations** concerning the type or level of medical care provided, or proposed to be provided, to a patient.[33]

This instruction demonstrates that the InterQual criteria is a screening tool and cannot be used as the sole basis for making a coverage decision. As a basis for supporting its denial of A.C.'s claims for benefits, Premera relies exclusively on its argument that A.C. failed to meet the InterQual criteria. Premera provides no additional rationale.

Premera does not address the risks that A.C. would have encountered had he simply been discharged when Premera terminated coverage. Premera gives no analysis regarding his previous failure at lower levels of care that would justify a conclusion that had A.C. been discharged, he would have been able to safely reside at home. Premera points to nothing in the record to suggest that A.C. was prepared for this transition. In contrast, Plaintiff has identified the failure of outpatient treatment to meet A.C.'s needs.[34]

Amber Haines was A.C.'s treating provider for more than a year, until November of 2018. She confirmed that outpatient treatment was "unsuccessful in helping him reach his goals due to the intensity, frequency, and duration of unsafe behaviors and emotions."[35] Ms. Haines explained

Due to the trauma history and attachment problems he was unable to engage in effective outpatient therapy and became resistant and combative in treatment. He was unable to receive and accept recommendations and responded by impulsively

---

[33] Rec. 946 (emphasis added).
[34] Rec. 23-34, 1026, 771, 774, 1970-1981.
[35] Rec. 774.

> refusing to engage in continued therapy therefore therapy ended abruptly and against the recommendation of myself and his mother.[36]

In essence Ms. Haines explained that A.C.'s attachment problems with his mother precluded effective outpatient treatment. Ms. Haines' explanation demonstrates that until those issues were resolved A.C. could not be safely and effectively treated in an outpatient setting.

And Dr. Favero who treated A.C. from March 2017 to April 2019 confirmed the medical necessity of A.C.'s care at CALO. Premera's argument that his recommendation was written after the fact makes no sense because it was written in support of N.C.'s appeal.[37] By definition, his letter of medical necessity would be written after-the-fact. Furthermore, ERISA requires an insurer to complete a full and fair review of a claimant's appeal. "A plan administrator must provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."[38] "A plan administrator 'may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician,' but is not required to automatically 'accord special weight to the opinions of a claimant's physician.'"[39] Furthermore, courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."[40]

But Premera's arguments and its denial letters make clear that Premera failed to engage with A.C.'s treating providers. Rather than respond to the identified needs of "hostility, distrust,

---

[36] *Id.*
[37] ECF Doc. 48, p. 5 of 27, fn 1.
[38] 29 C.F.R. § 2560.503-1(h)(2)(iv).
[39] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).
[40] *Taylor v. Reliance Standard Life Ins. Co.,* 837 F. Supp. 2d 1194, 1206 (W.D. Wash. 2011) (citing *Nord* 538 U.S. at 834).

and inability to tolerate discussion about his functional difficulties and psychiatric symptoms," Premera ignored the medical record because the letter was written after the fact.[41] Premera also ignored the letter written by A.C.'s previous therapist, identifying her as a social worker.[42] But Ms. Haines' and Dr. Favero's letters provided the evidence of the behavior that A.C. would risk if he were to receive treatment at a lower level of care.[43] Dr. Favero stated:

> Due to his chronic and deteriorating symptom picture, increasing dysfunction at school and home, hostility and/or complete withdrawal in relationships, and concerns related to his and others' safety, **I concluded that he met medical necessity criteria for long term residential treatment and recommended this course be pursued**. …[44]

Even with this level of documentation, Premera insists that Plaintiff has produced no evidence of the medical necessity of A.C.'s care. The evidence in the Record shows the contrary to be true.

Plaintiff does not take the position that just because an insurer has covered an initial stay that it must therefore cover all additional dates. Rather, Plaintiff's position is that when an insurer covers benefits that require a finding of medical necessity, unless there is a change in the behavior of the patient that justifies its denial of benefits, there is no rational basis to refuse to provide continued coverage. Any other result allows an administrator to deny coverage based on an arbitrary date.[45]

In *Charles W.* the district court found that while the patient had ups and downs, her condition during the time that benefits were paid and after the administrator denied them was

---

[41] Rec. 771.
[42] ECF Doc. 48, p. 10 of 27; Rec. 774.
[43] Rec. 771, 774.
[44] Rec. 771 (emphasis added).
[45] *Charles W. v. Regence BlueCross BlueShield of Or.*, 2019 U.S. Dist. LEXIS 167184, at *26-32 (D. Utah Sep. 27, 2019)

essentially the same.[46]  Because there had been no substantive change in behavior, the court

reversed the decision to deny benefits because the denial date was arbitrary.[47]

While the administrator in *Charles W.* applied MCG criteria instead of InterQual, the

court explained the limited role that medical policy guidelines should play when terminating

benefits.

> Given the arbitrariness of the date selected by Regence, it appears to the court that
> the decision was based more on preconceived notions regarding the maximum
> amount of time a person should receive care, rather than on a case-specific
> assessment of [the patient]'s needs. This is inappropriate.[48]

 The court further explained:

> The MCG might be a helpful tool but were not intended to operate as a sole basis
> for denying treatment or payment. The MCG are to be applied to individual
> patients on a case-by-case basis and always in the context of a qualified
> healthcare professional's clinical judgment.[49]

The same problem exists for Premera in this case. Premera's guidelines and denial rationale

suggest a willingness to pay for short term residential treatment but Premera denied longer term

benefits by suddenly claiming that the patient didn't meet the criteria. The following table

illustrates the symptoms that Premera claims A.C. needed to demonstrate according to InterQual

and the actual rationale provided in the denial letters.

| InterQual Symptoms | Denial letter rationale |
| --- | --- |
| Must have disruptive behavior | Not wanting to harm self or others |
| Psychomotor agitation/retardation | Could care for daily needs |
| Depersonalization | Not seeing things |

---

[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.* (citing *H.N. v. Regence BlueShield*, 2016 U.S. Dist. LEXIS 178182, at *11 (W.D. Wash. Dec. 23, 2016).

| Hypervigilance/paranoia | No severe depressive symptoms requiring around the clock supervision |
|---|---|
| Psychiatric medication resistant and anxiety, depressed, hypomanic, obsessions/compulsions, or psychosis | Safely managed in less restrictive setting |
| Non suicidal self-injury | No dangerous psychiatric behaviors |
| suicidal /homicidal ideation without intent | No comorbid medical problems |
| | No withdrawal symptoms or gross dysfunction |

Premera's denial reasons do not match up with the InterQual criteria. For example, Premera's denial letters did not even discuss the question of disruptive behavior. A fundamental problem with Premera's denial letters is that they rely on the alleged failure of CALO to comply with all the InterQual criteria but Premera's denial letters fail to explain how it applied the criteria's multiple steps when reviewing A.C.'s claims.

For example, the denial letters make no mention of A.C.'s diagnoses. These included major depressive disorder, recurrent, mild; attention-deficit hyperactivity disorder, predominantly inattentive type; reactive attachment disorder; and posttraumatic stress disorder.[50] Throughout his treatment, CALO reviewed and updated A.C.'s treatment plan consistent with A.C.'s progress and challenges.[51] The updated treatment plans modified the goals and objectives for A.C.'s treatment.[52] The therapy notes identified progress and the persistence of A.C.'s ongoing issues with anxiety, fear, and anger related to A.C.'s relationships with his mother and sister.[53] Until his transition to discharge, those issues had not been resolved so that A.C. could

---

[50] Rec. 778.
[51] Rec. 358-363, 119-1125, 424-429, 3565-3570.
[52] *Id.*
[53] Rec. 152-153, 172, 278, 320, 322.

have been safely treated at a lower level of care. Neither the InterQual criteria, nor the stated rationale for denial of benefits account for the supported medical basis for A.C.'s care.

### C. Premera Never Explained Why it Disagreed with the Unrefuted Recommendations of the Clinicians Treating A.C.

Premera ignores the unrefuted recommendations of A.C.'s treating providers.

In particular, Premera failed to account for the safety that CALO provided and ignored the care recommendations of A.C.'s treating clinicians. A.C.'s treating clinician at New Visions recommended "long-term therapeutic placement."[54] Therapist Claire Vos MS, LPC, wrote: "Although substantial gains are being made in his treatment, a return to his home setting or another setting without a robust therapeutic program would cause significant regression and the return of [A.C.]'s negative coping strategies."[55] To avoid this regression, nine days of coverage was clearly insufficient. Premera never refuted this medical opinion and without evidence concluded that A.C. did not require residential care.

Premera relies on *Julie L. v. Excellus Health Plan, Inc.*[56] to argue that an absence of a psychological evaluation in the medical record means that a plaintiff cannot show that treatment was medically necessary.[57] But *Julie L.* does not support Premera's argument. First, *Julie L.* dealt with treatment at a wilderness treatment center and not a residential treatment center. [58] Second, *Julie L.* stated that there was no evaluation before or during treatment.[59]

In this case, the medical record contains a neuropsychological report, and many medical records that reflect diagnoses of depression, reactive attachment disorder, and anxiety, all of

---

[54] Rec. 1026.
[55] *Id.*
[56] 447 F. Supp. 3d 38 (W.D.N.Y. 2020).
[57] ECF Doc. 48, p.13 of 27.
[58] *Julie L.* at 49.
[59] *Id.*

which were based on the examination, testing, and treatment of A.C.[60] The medical record also contains letters from treating providers that supported the medical necessity of A.C.'s care.[61] Premera simply decided not to take those records into account when it wrongly denied benefits.

Premera erroneously states that A.C. did not receive any continuing evaluation to determine a time frame for discharge.[62] This is wrong. Premera acknowledges that A.C. continued to be seen by his psychiatrist and the Record contains several treatment plans that were updated on a monthly basis.[63] Those treatment plans documented when goals were expected to be achieved and goals were modified as necessary.[64] Premera confuses its imposed short-term treatment duration as an absence of discharge planning because those plans are anticipated to take longer than Premera desires.

Premera offers a distorted summary of A.C.'s treatment history and the services that A.C. received all the while ignoring many facts in the medical record simply to argue that A.C.'s treatment was not medically necessary.[65] Premera claims that CALO's records "all indicate that A.C. has no psychiatric problems."[66] But the pages that Premera cites are only parts of more complete evaluations that confirmed ongoing medication management and multiple psychiatric diagnoses.[67] Also, when describing A.C.'s diagnosed conditions by Dr. Favero, Premera lists A.C.'s attention deficit hyperactivity disorder, major depressive disorder and anxiety disorder.[68]

---

[60] Rec. 358-363, 424-429, 994-1003, 1119-1125, 3565-3570, 3577-3579.
[61] Rec. 771-774.
[62] ECF Doc. 48, p. 13 of 27.
[63] Rec. 358-363, 424-429, 994-1003, 1112-1114, 3565-3570, 3577-3581.
[64] *Id.*
[65] ECF Doc. 48, pp. 3-11 of 27.
[66] ECF Doc. 48, p. 14 of 27.
[67] 326-329, 349-351, 3694-3698.
[68] ECF Doc. 48, p. 2.

Premera omits Dr. Favero's additional diagnosis of post-traumatic stress disorder. [69] More

significantly, Defendant's briefing fails to even mention A.C.'s diagnosed reactive attachment

disorder.[70]

Premera also ignores the multiple modality interventions CALO provided. Premera

describes CALO as follows:

> [CALO] uses "canine therapy," with 40 Golden Retrievers, and "students raise,
> train, feed, and sometimes adobe a Calo Canine" to "learn how to create and
> maintain reciprocal relationships," "learn empathy," and "learnt to give." . . . The
> Academy has a fully accredited high school which A.C. attended.[71]

This description of CALO suggests it is not a therapeutic residential treatment facility.

Premera's characterization fails because it ignores key facts. First, the State of

Missouri licensed CALO to provide residential treatment for children and youth.[72]

Additionally, CALO has been accredited by The Joint Commission as a behavioral health

care program.[73] Finally, Premera's attack on CALO's services undermines its own

decision to pay for the first days of services. On one hand, Premera determined that A.C.

was eligible for services, but now that it wants to avoid payment, Premera resorts to a

mischaracterization of the quality of CALO's treatment of A.C.

Premera also err when it asserts there is "no psychiatric evaluation or other

medical record concluding that residential treatment was medically necessary."[74] This

statement is demonstrably false. On June 18, 2019, CALO's initial treatment plan

identified A.C.'s diagnoses of major depression, reactive attachment disorder, and

---

[69] *Id.*, Rec. 3451.
[70] ECF Doc. 48.
[71] ECF Doc. 48, p. 5 of 27.
[72] Rec. 789.
[73] Rec. 822.
[74] ECF Doc. 48, p. 5 of 27.

posttraumatic stress disorder.[75] That treatment plan was signed by A.C.'s psychiatrist, two therapists, and the academic director.[76] In addition, the treatment plan documented that "Adam's psychiatrist feels a residential placement is appropriate *at this time.*"[77] Moreover, CALO documented its medication management which has a section titled psychiatric evaluation.[78] Even when Premera acknowledges that these documents are found in the record it still asserts there "is no psychiatrist's statement in the record at that time recommending residential treatment."[79] This misstatement about a critical fact in the Record is repeated numerous times in Premera's opening memorandum.[80]

A.C.'s treatment plans constitute medical records showing that residential treatment was indeed recommended. The initial treatment plan identified the reasons for admission that included A.C.'s unsuccessful response to lower levels of care. In fact, his behavior was getting worse and worse in spite of therapeutic interventions.[81] The same report documented A.C. problems with depression and that these issues manifested as becoming angry very easily and experiencing significant mood swings between being loving to angry and back again. While it was not reported that he was ready to act on his suicidal statements, the treatment plan documented that A.C. made suicidal statements that were "provocative."[82]

---

[75] Rec. 778.
[76] Rec. 779.
[77] Rec. 778 (emphasis added)
[78] Rec. 191, 272, 278, 326, 350, 385, and 407.
[79] ECF Doc. 48, p. 5 of 27.
[80] ECF Doc. 48, pp. 2, 3, 6, 12, 13, 16, and 17 of 27.
[81] Rec. 778
[82] *Id.*

Premera states without evidence that CALO "backdated" its initial treatment plan.[83] It bases its claim on the dates of the digital signatures attached to the document.[84] While it is true that the document was digitally signed after-the-fact, Premera has no basis to suggest that the document was backdated. In fact, the next treatment plan is dated August 1, 2019 and is digitally signed by the various participants in August, September, and October of 2019. Premera's argument only shows that the participants who created the treatment plan signed it after it was created, not that it was created after the date on the record.

Puzzlingly, Premera simultaneously acknowledges that Dr. Jyotsna Nair, MD, evaluated A.C. but then asserts that there were no psychological or psychiatric evaluations.[85] Premera also describes A.C.'s visits as going "well."[86] But that statement comes from A.C.'s description and Premera omitted all of the following that occurred on the visit: A.C. acquiesced to the needs of his sister to keep the peace, and A.C. experienced heightened anxiety and trauma when trying to sleep in his own room during the visit.[87] In the March 2020 visit, A.C. expressed anxiety over contact with his sister, especially surrounding traumatic experiences and fears about addressing those issues with his sister.[88] The visit in July 2020, occurred 13 months after treatment began and a transition home was expected in the next 6-8 weeks.[89]

---

[83] ECF Doc. 48, p. 6 of 27.
[84] *Id, see also* Rec. 778-779.
[85] ECF Doc. 48. 6 of 27.
[86] ECF Doc. 48, p. 6 of 27.
[87] Rec. 2418.
[88] Rec. 2149.
[89] Rec. 3679.

Premera can attempt to obfuscate the Record but a fair reading of the medical and progress notes reveals that A.C. was an adolescent who had been diagnosed with severe mental health conditions and that those conditions had worsened over a long period of time. Had Premera fairly considered the medical record and the recommendations of A.C.'s treating clinicians it would have found A.C.'s treatment medically necessary and approved coverage. Premera's decision must be reversed.

### D. Premera Denied A.C. Coverage Because it Applied Acute Care Symptom Requirements for A.C.'s Subacute Residential Care.

Premera's arguments show that it withheld benefits for *subacute* mental health treatment when A.C. failed to exhibit *acute* symptoms. It was wrong for Premera to require "dangerous psychiatric behaviors" or "other gross dysfunction" to justify continued care.[90] Even more problematic was the denial rationale that services were not covered because A.C. did "not have any active plans to end your life or others."[91] Outside of residential treatment, A.C. behaviors might have deteriorated to those levels, but residential treatment avoided a return to hospitalization. Because Premera applied the wrong standard when evaluating A.C.'s claim, its decision to deny benefits should be reversed and Premera should be required to cover A.C.'s care at CALO.

Premera admits that when it sent the Level 1 appeal to an external psychiatrist that the determination to deny benefits was because A.C. was not "suicidal, homicidal, or gravely

---

[90] Rec. 4249; *See James F. ex rel. C.F. v. Cigna Behavioral Health, Inc.*, No. 1:09CV70 DAK, 2010 U.S. Dist. LEXIS 136134, at *16 (D. Utah Dec. 23, 2010).
[91] Rec. 4246

impaired."[92] The reviewer also listed the absence of other severe depressive, psychotic, delusion, or manic conditions.[93] But these conditions are not required by InterQual for residential care. Rather, they are consistent with inpatient hospitalization care.[94]

Premera makes the unsupported logical leap that because A.C. did not have weekly psychiatric evaluations that therefore A.C. "did not have any severe depressive symptoms that required 24-hour supervision."[95] Premera's conclusion does not follow from its premise. Furthermore, it completely ignores the opinions of treating professionals that A.C. could not be effectively treated outside of a residential setting.[96] It also ignores the safety that CALO provided so that A.C. could effectively work on his issues.[97] Nowhere does Premera provide any basis to refute the medical record that in the absence of CALO's care A.C.'s behavior would not have reverted to the dysfunction he was experiencing before he went to CALO.[98] Rather it is an illustration that Premera required more severe symptoms than residential treatment requires.

Non-acute residential treatment centers often treat patients for a longer duration for patients that have not responded to lower levels of care.[99] This conclusion was based on peer reviewed scientific literature that showed residential treatment to be highly effective for these types of patients.[100] Premera relies on cases where it was reasonably determined that a patient

---

[92] ECF Doc. 48, p. 10 of 27, Rec. 1949
[93] *Id.*
[94] Rec. 1701-1712
[95] ECF Doc. 48, p. 15 of 27.
[96] Rec. 771, 774.
[97] *Wiwel v. IBM Med. & Dental Ben. Plans for Regular Full-Time & Part-Time Emps.*, 2017 U.S. Dist. LEXIS 46377, at *11-12 (E.D.N.C. Mar. 29, 2017)
[98] Rec. 1026
[99] *H.N. v. Regence BlueShield*, No. 15-CV-1374 RAJ, 2016 U.S. Dist. LEXIS 178182, at *20-21 (W.D. Wash. Dec. 23, 2016)
[100] *Id.*

had met the criteria for a less restrictive level of care.[101] But these cases do not help Premera because it has not shown that A.C. could be safely treated at home.

Premera cannot disprove the unrefuted statements that A.C. required residential treatment to avoid regression and the identified anxiety and risk factors at his home.[102] Its decision to deny benefits was unsupported and wrong. Premera characterizes A.C.'s letters of medical necessity as "not medical records" even though they were written by providers.[103] There is no basis for Premera's argument in light of the fact that the documents were prepared by treating clinicians who understood A.C.'s history and the likelihood of safe and effective treatment outside of the residential treatment center.

## III.    PLAINTIFF HAS PROVEN THE ELEMENTS OF HER MHPAEA CLAIM.

A comparison of its skilled nursing facility criteria with the corresponding residential treatment criteria proves that Premera violated MHPAEA. Premera agrees a MHPAEA violation occurs when there is a "disparity between the treatment limitation on mental health/substance abuse benefits as compared to the limitations that defendants would apply to the covered medical/surgical analog."[104] Plaintiff has identified several disparities that violate MHPAEA.

### A.    Premera's InterQual Guidelines Contain Disparate Requirements That Disadvantage Mental Health and Substance Use Disorder Claimants.

One treatment limitation disparity is that Premera requires for skilled nursing facilities a patient needs to actively participate in care.[105] In contrast a patient seeking coverage for

---

[101] ECF Doc. 48, p. 16 of 27.
[102] Rec. 771-774.
[103] *Id.* and ECF Doc. 48, pp. 16-17 of 27.
[104] ECF Doc. 48, p. 17 of 27, (citing *Heather E. v. Cal. Physicians' Servs.*, 2020 U.S. Dist. LEXIS 136467, at *7-8 (D. Utah July 30, 2020).
[105] Rec. 6169

admission to a residential treatment facility must be unable or unwilling to follow instructions or unable to maintain behavioral control for 48 hours.[106] This inconsistency violates both MHPAEA and common sense. A residential treatment center often receives patients who have just come from inpatient hospitalization. Sometimes those patients could not or would not follow instructions until they had been stabilized on medication or some other therapeutic intervention. But Premera requires subacute mental health and substance use disorder patients to display the same kinds of behaviors as those who would qualify for inpatient hospitalization.

A second disparity is that skilled nursing facilities require functional impairment requiring at least minimum assistance.[107] These impairments can include: gait evaluation and training, transfer training, therapeutic treatment to ensure patient safety.[108] These are fairly simple tasks, but they can require assistance after surgeries or other injuries. In contrast to these minimum functional impairments, Premera requires claimants seeking coverage for care at a residential treatment center to show that their functional impairment is severe.[109] The disparity between those requirements is clear and disadvantages those, like A.C., seeking coverage for mental health and substance use disorder care at residential treatment centers.

A third disparity is that a claimant may need to show that her symptoms have been persistent or repetitive for six months.[110] Plaintiff cannot find any such requirement for a skilled nursing facility. If a problem requiring services arises, it can be treated without a showing of

---

[106] Rec. 1722
[107] Rec. 6169
[108] *Id.*
[109] Rec. 1722.
[110] *Id.*

repetition or persistence. This results in a prejudicial treatment limitation for mental health and substance use disorder claimants.

A fourth example of a MHPAEA violation is that continued care ends at a skilled nursing facility when services are for custodial care, patient unwilling to cooperate, routine medical administration.[111] Claimants seeking coverage for analogous care in residential treatment facilities must show symptoms like aggressive or assaultive behavior, homicidal ideation, or non-suicidal self-injury to occur during the previous week.[112] These requirements for mental health and substance use disorder claimants add both an intensity of symptom requirement as well as a temporal requirement in terms of when the event must have occurred.

These four examples show that Premera applies "separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits."[113] Premera's reliance on *Julie L.* is misplaced because the disparity is seen on the face of the guidelines that Premera admits to using when evaluating claims for skilled nursing facilities and residential treatment centers.[114] Plaintiff has shown numerous instances where Premera's criteria treats medical/surgical claimants seeking coverage for care at skilled nursing facilities more favorably than analogous mental health and substance use disorder claimants seeking care at residential treatment facilities. In like manner, Premera's reliance on *A.H. v. Microsoft* is also misplaced because this claim does not relate to a wilderness argument.[115]

---

[111] Rec. 6169.
[112] Rec. 1724-1726.
[113] 29 U.S.C. 1185a(a)(3)(A)(ii).
[114] ECF Doc. 48, p. 19 of 27
[115] ECF Doc. 48, p. 20.

Finally, Premera's claim that its own draft parity compliance document proves that there is no disparity misses the mark because it fails to address any of the disparities mentioned above, or its hospice requirements.[116]

### B. Even if Some Premera Criteria Comply with MHPAEA, Such Compliance Does Not Excuse its Other Violations.

Premera attempts to misdirect the attention away from its disparate treatment limitations and claim that it has comparable restrictions for skilled nursing facilities, rehabilitation facilities, and residential treatment centers.[117] But even if Premera imposes facility requirements and requires preauthorization for those medical/surgical services, those similarities do not undo the disparities. Premera's argument is like comparing two job candidates who are of the same height and weight but are different in terms of skill, education, and experience and , concluding that because some similarities exist that they are essentially the same.

### C. Inpatient Hospice and Residential Treatment Centers are Analogous Levels of Care.

Premera rightly predicted that Plaintiff would rely on a recent case that found that inpatient hospice services are analogous to residential treatment services.[118] While Premera may disagree with that decision, the conclusion is sound and has been supported by numerous decisions.[119] The proper MHPAEA analysis is not whether the "exact type of care" received was

---

[116] ECF Doc. 48, p. 23 of 27, Rec. 6216-6220.

[117] Rec. 20-21.

[118] ECF Doc. 48, p. 22 of 27.

[119] *See D.K. v. United Behavioral Health,* 2020 U.S. Dist. LEXIS 130545, *7-8 (D. Utah 2020); *David S. v. United Healthcare Ins. Co*., 2020 U.S. Dist. LEXIS 182120, at *11-14 (D. Utah Sep. 30, 2020) ; *Johnathan Z. v. Oxford Health Plans*, 2020 U.S. Dist. LEXIS 21968, (D. Utah Feb. 7, 2020); *David P. v. United Healthcare Ins. Co.*, 2020 U.S. Dist. LEXIS 21967; *Michael W. v. United Behav. Health*, 420 F. Supp. 3d 1207, 1236 n.13 (D. Utah 2019) ; *B.D. v. Blue Cross Blue Shield of Georgia*, 2018 U.S. Dist. LEXIS 16993 (D. Utah Jan. 31, 2018).

the same A.C. could have received at a medical/surgical facility; rather, it is whether the administrator uses less restrictive criteria for coverage for the analogous "level of care" in a medical/surgical treatment facility than it did for mental health/substance abuse treatment.[120]

## IV. MHPAEA VIOLATION CLAIMS ARE NOT DUPLICATIVE OF DENIED BENEFIT CLAIMS.

In the Ninth Circuit, plaintiffs may seek relief under both 29 U.S.C. § 1132(a)(1)(B) and § 1132(a)(3), so long as the remedy sought is not duplicative.[121] Permitting plaintiffs to state both as alternative theories of liability is consistent with the Federal Rule of Civil Procedure 8(a)(3) and with "ERISA's intended purpose of protecting participants' and beneficiaries' interests."[122] As discussed in *K.K. v. Premera Blue Cross*,[123] the appropriate limitation is that a Plaintiff may not obtain a double recovery in the event it prevails on both her MHPAEA and denied benefits causes of action. But a Plaintiff may be entitled to payment and appropriate equitable relief. In this instance, Plaintiff requests the opportunity to more fully address the question of appropriate relief in the event the Court rules in her favor on both causes of action. Only after a ruling on the denied benefits claim can it be determined if the remedy will make the Plaintiff whole if the Court also finds that Premera violated MHPAEA.

## CONCLUSION

For all the above reasons Plaintiff's Motion for Summary Judgment should be granted and Defendant's Motion for Summary Judgment should be denied.

---

[120] *Michael W. v. United Behavioral Health*, 420 F. Supp. 3d 1207, 1236 n.13 (D. Utah 2019)
[121] *Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 961 (9th Cir. 2016).
[122] *Id.* at 962; *see also* Fed. R. Civ. P. 8(a)(3) ("a pleading . . . may include relief in the alternative or different types of relief").
[123] No. C21-1611-JCC, 2022 U.S. Dist. LEXIS 95710, at *10 (W.D. Wash. May 27, 2022)

RESPECTFULLY SUBMITTED this 1st day of August 2022.

      */s/ Eleanor Hamburger*
Eleanor Hamburger, WSBA #26478
SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 Western Avenue, Suite 350
Seattle, WA 98121
Tel. (206) 223-0303
Fax (206) 223-0246
      Email: ehamburger@sylaw.com

      */s/ Brian S. King*
Brian S. King, *Admitted Pro Hac Vice*
BRIAN S. KING, P.C.
420 E. South Temple, Suite 420
Salt Lake City, UT 84111
Tel. (801) 532-1739
Fax (801) 532-1936
Email: brian@briansking.com

## CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury under the laws of the State of Washington and the United States, that on the 1st day of August, 2022, the foregoing document was presented to the Clerk of the Court for filing and uploading to the Court's CM/ECF system. In accordance with the ECF registration agreement and the Court's rules, the Clerk of the Court will send email notification of this filing to all attorneys in this case.

DATED: August 1, 2022

/s/ Brian S. King
Brian S. King, *pro hac vice*