1        UNITED STATES DISTRICT COURT

2     WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3  _____

4                              )
   N.C., individually and on    ) C21-01257-JHC
5  behalf of A.C., a minor,      )
                                 ) SEATTLE, WASHINGTON
6            Plaintiffs,         )
                                 ) October 24, 2022
7  v.                            )
                                 ) 9:00 a.m.
8  PREMERA BLUE CROSS,           )
                                 ) Motion Hearing
9            Defendant.          )

10 _____

11            VERBATIM REPORT OF PROCEEDINGS
             BEFORE THE HONORABLE JOHN H. CHUN
12            UNITED STATES DISTRICT JUDGE

13 _____

14

   APPEARANCES:
15

16

17   For the Plaintiffs:    Brian King
                            Brian King Attorney at Law
18                          420 E. South Temple
                            Suite 420
19                          Salt Lake City, UT 84111

20                          Eleanor Hamburger
                            Sirianni Voutz Spoonemore
21                          Hamburger
                            3101 Western Avenue
22                          Suite 350
                            Seattle, WA  98121
23

24

25

1    For the Defendant:     Gwendolyn C. Payton
                            Kilpatrick Townsend & Stockton
2                           LLP
                            1420 Fifth Avenue
3                           Suite 3700
                            Seattle, WA  98101
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Stenographically reported - Transcript produced with computer-aided technology**

1          THE CLERK:  This is case No. C21-1257.  N.C. versus

2   Premera Blue Cross.  Counsel, please rise and make your

3   appearances for the record.

4          MR. KING:  Brian King and Ellie Hamburger for the

5   plaintiff.

6          MS. PAYTON:  I'm Gwendolyn Payton, for Premera Blue

7   Cross.  Along with me is Melissa Anderson, from Premera Blue

8   Cross.

9          THE COURT:  Okay.  Let me just get set up here.

10     Each side has 20 minutes for oral argument.  I may follow

11   up with additional questions.

12     Mr. King, you're up first.  Would you like to reserve any

13   time for rebuttal?

14          MR. KING:  Yes, Your Honor.  Five minutes is fine.

15          THE COURT:  Okay.  Go ahead.

16          MR. KING:  Good morning, Your Honor.  Pleased to be

17   with you in person here in Seattle.

18     As you know, this involves a young -- an individual who

19   was adopted at a very early age, and had some significant

20   mental health issues.  The threshold issue before the court

21   is the standard of review; and that is something that I think

22   the parties are in pretty good agreement on.  I'll certainly

23   not commit Premera to their position here.

24          THE COURT:  When you raised it, it was de novo.  It

25   seemed they didn't really respond to that.

1          MR. KING:  The thing I think the parties agree -- it

2     is de novo -- is that this is a fully insured plan.  And

3     ERISA plans that are fully insured, are subject to state

4     insurance law.  And state insurance law here in the State of

5     Washington is quite clear, in saying that discretionary

6     authority clauses are banned, and therefore the courts are

7     required to give de novo consideration to these cases.

8          Another important issue, we think, and I think we probably

9     have a little more disagreement on this point, is what the

10    scope of review is.  Our position is that the scope of

11    review, Your Honor, is limited to the pre-litigation appeal

12    record.  And that information, specifically reasons for

13    denial that were not raised by Premera during that

14    pre-litigation appeal process, are not something that are

15    available to be raised here.

16         The body of law that deals with the need for exhaustion of

17    remedies and for a thorough, adequate, pre-litigation appeal

18    record to be developed for this court to review, as opposed

19    to being the initial fact finder, is extensive, both in the

20    Ninth Circuit and across the country.  And it applies here.

21         We have a situation where this individual was covered by

22    the plan from June 18th through -- the treatment, rather, was

23    provided at Change Academy Lakes of the Ozarks, which I will

24    call CALO, from June 18, 2019, through sometime in July, I

25    believe, in 2020.  The patient was seen by Dr. Neer, who was

1  an MD at CALO.  The pre-litigation process, there was a

2  denial letter in September of 2019.  There was an appeal to

3  that denial, in February 2020.  That appeal letter contained

4  a number of letters of medical necessity from various

5  individuals, who were treating clinicians of the child.

6       Then there was a denial letter relying on an AllMed

7  review, an external reviewer, in July of 2020, from Premera.

8  And that review relied on an AllMed external reviewer.  And

9  there was a great deal of acute symptomology language in that

10 letter.  And that gives rise to a number of the arguments

11 that we have here today.

12      The second-level appeal from the family was in August of

13 2020.  And then there was a final denial letter, Your Honor,

14 in September of 2020, in which the reviewer indicated that

15 the reason for denial -- there were like two or three

16 reasons, but one of the primary reasons was that the child

17 did not have active plans to end his life, or others'.

18      What we have here is several problems, as to both causes

19 of action.  We have two causes of action, Your Honor.  One is

20 the wrongful denial of benefits; and then the second is the

21 mental health parity claim.  I'll talk about the wrongful

22 denial of benefits action first.

23      We contend, as we outlined, and I think most specifically

24 and clearly it's outlined in the opposition memo, Your Honor,

25 on Page 5, that the claim was wrongfully denied, for a number

1   of reasons.  First, it ignores the requirements of the
2   medical necessity that are outlined in the policy itself.
3   What you've got is the InterQual medical necessity criteria.
4   But they have to yield to the language, the unambiguous
5   language of the plan document itself.
6           THE COURT:  So let me ask you a question about that.
7   Pointing to the unambiguous language in the plan, the plan
8   ties medical necessity to generally accepted standards of
9   medical practice.  Premera's position is they relied on
10  InterQual, which is generally accepted.  What do you think I
11  should apply here, since it's a de novo review?
12          MR. KING:  Well, we don't have a problem if you apply
13  the generally accepted standards of medical practice.
14          THE COURT:  Which ones?
15          MR. KING:  Well, I don't have a problem, necessarily,
16  applying the InterQual criteria.  Because the InterQual
17  criteria, at times, we believe, are somewhat deviant from
18  generally accepted standards of medical practice.  But I
19  don't think it's necessary for the court to get into the
20  details of that, for this reason.
21      The actual criteria that's applied by Premera in denying
22  the claim is so at odds with both the standards of InterQual
23  and the generally accepted standards of medical practice
24  language that's in the plan, I think you're going to find
25  that under de novo standard of review, there was a

1  significant deviation in the sense that Premera's reviewers

2  specifically talk about acute medical necessity criteria, in

3  a way that neither the language of the plan nor InterQual

4  allow.

5          THE COURT:  But if it's de novo review, though,

6  doesn't it mean I look at it anew?  If it were an abuse of

7  discretion, of course, I would be taking a look at what they

8  did.  But if it's de novo review, I'm the fact finder here,

9  right?

10          MR. KING:  That's a great question.  And courts

11  across the country have struggled with that.  What does de

12  novo review mean?  Is what you're asking me.  And I think

13  what we can say is, most courts say you're still reviewing a

14  pre-litigation appeal record.  In other words, de novo

15  review, to get back to the scope of review we just talked

16  about before, doesn't require the court to go beyond the

17  reasons for denial of the claim that were outlined by

18  Premera.

19     Obviously, de novo review means you don't confer -- you

20  don't defer, to any degree, to what Premera said.  And, of

21  course, that's a big difference between standard, the

22  standard of review under abuse of discretion, and de novo.

23  But you're still bound by the pre-litigation appeal record.

24     So I am comfortable with the court saying:  Look, the

25  language of the plan is what dictates here.  Generally

1   accepted standards of medical practice dictate.  And

2   specifically for purposes of this case, Your Honor, the thing

3   that allows you to, I think, feel comfortable in saying that

4   the denial is unjustified is that, especially as you get

5   further down the road, and the scope of the issues that

6   Premera is relying on to deny the claim narrows, you're

7   seeing that there's more and more talk about -- oddly enough,

8   there's more and more talk about acute symptomology, and the

9   need -- the absence of the child's medical records of acute

10  symptomology.

11          THE COURT:  Are you talking about acute symptomology

12  versus intensity of service?

13          MR. KING:  No.  Intensity of service is the kind of

14  services that were provided at CALO.  I'm talking about

15  Premera requiring the child to be sicker than the child

16  actually was, in order to qualify for benefits.

17          THE COURT:  Well, I guess I'd like you to explain for

18  me how he qualifies under InterQual.  And also I'm curious as

19  to whether he qualifies under any other standards, for

20  example, *Milliman*, or the *Wit*-case approach that you advanced

21  in the *Todd R.* case.

22          MR. KING:  Well, the *Wit* case, as you know, arose out

23  of the Northern District of California.  It's on appeal now

24  before the Ninth Circuit.  The Ninth Circuit issued a panel

25  opinion reversing *Wit*.  But there was an en banc petition

1    filed, and that's now under review.

2       One of the things that came out of *Wit*, on the part of

3    United, who was the defendant in *Wit*, was they knew the level

4    of criteria, called CASII, Child and Adolescent Service

5    Intensity Instrument, I think is what CASII stands for.

6    Whether you use CASII, InterQual or Milliman, one of the

7    things that's critical is that subacute treatment be

8    evaluated for subacute symptomology, as opposed to imposing

9    on some future requirement of acute symptomology.

10       So what we would say is, I think that the InterQual

11    criteria -- and we could go through that -- makes it clear

12    that there are a variety of things that need to happen.  The

13    child needs to be sufficiently ill, to require inpatient care

14    at all.  But it also can't be a situation where the child is

15    so sick, such as acutely and actively suicidal or homicidal,

16    actively psychotic, unable to care for their basic needs.

17    Those are the kinds of things that require acute inpatient

18    treatment, as opposed to, you have to be able to cooperate in

19    your treatment.

20       In that sense, Your Honor, there's a bit of a blending

21    here that's interesting, and I think instructive for the

22    court, in the mental health parity analysis for skilled

23    nursing facilities.  Because one of the things you see with

24    skilled nursing is that the patient has to be able to be

25    involved in and participating in their treatment.  And what

1  you see, on the other hand, when you're talking about the

2  requirement of the acuity of symptomology for this particular

3  situation in a residential treatment center, is that they

4  have to be so ill they can't carry out many of the daily

5  activities of daily living, the ADLs.  Or they have to be

6  acutely suicidal or homicidal.

7      The last letter sent talked about there has to be very

8  serious psychiatric symptoms, and there has to be active

9  plans to end your life, or others'.  Well, if you have that

10  level of severity of illness, you would undoubtedly need

11  acute inpatient hospitalization, as opposed to residential

12  treatment.  So we're talking about a continuum of care, a

13  continuum of symptomology.

14          THE COURT:  So would you agree, though, if I find in

15  your client's favor of a denial of benefits claim, I'd need

16  to hang my a hat on some generally accepted standards.  So

17  I'm asking you --

18          MR. KING:  Yes.

19          THE COURT:  -- which should I apply?

20          MR. KING:  I think that you can apply -- first and

21  foremost, the guiding principle the court should look to is

22  the language of the plan.

23          THE COURT:  Right.  But the plan references generally

24  accepted standards.

25          MR. KING:  Right.  And I think that the CASII

1    guidelines that are currently used and that were developed,

2    arising out of *Wit*, to address Judge Spero's concerns in *Wit*

3    are good criteria.

4         THE COURT:  Are those comprehensively laid out in the

5    *Wit* opinion?

6         MR. KING:  No.  CASII is the acronym.  And if you --

7    I think that's the most recent, the most up-to-date,

8    generally accepted standards of medical practice, or talking

9    about what's medically necessary, and what's not, when you're

10   talking about individuals who are being either acutely

11   inpatient hospitalized, or residential treatment, or being

12   treated on an outpatient basis.

13        But look, Your Honor, I'm not stuck on CASII.  I think

14   Milliman or InterQual --

15        THE COURT:  If I want to go with Milliman, where do I

16   look?

17        MR. KING:  If you look up Milliman Care Guidelines,

18   or MCG, you'll find them, no problem.  They're publicly

19   available.

20        THE COURT:  And even though they're publicly

21   available, if they're not part of the record, can I still

22   look to them?

23        MR. KING:  I think you can.  You can take judicial

24   notice of them, in that they've been referred to in many

25   other cases.  InterQual has been referred to in a number of

1  cases, of course.  And they've been criticized at times.  But

2  I think that the most up-to-date, most credible standards of

3  generally accepted standards of medical practice, are the

4  CASII guidelines.  United ended up developing them, in light

5  of the *Wit* decision.  And they live by them today.  United

6  is --

7        THE COURT:  You've got less than three minutes; I'm

8  curious about this Parity Act claim.

9        MR. KING:  Yes.  Thank you.  Well, I mentioned, Your

10 Honor, that's where the two come together a little bit, these

11 arguments, because for both the wrongfully denied benefits

12 claim and the parity argument, what we're talking about is a

13 more limiting group of requirements by the plan, to qualify

14 for benefits for this residential treatment, than for

15 medical-surgical treatment for the parity analysis.

16     I think the best analysis we've got, and we talk about it

17 in both our opposition and reply memo, Your Honor, but I'm

18 looking at pages 22 and 23 of our opposition memo.  There are

19 three particular things, particularly in regard to skilled

20 nursing facilities that we talk about, that are compared to

21 residential treatment centers, which are quite a bit more

22 restrictive and limiting, in terms of the availability of

23 benefits.

24     That's the heart of a MHPAEA analysis, is there a

25 disparity between the degree to which you provide benefits

1    for mental health and substance use disorders for a certain

2    level of care, compared to the analogous medical care for

3    medical and surgical treatment.  And we think those things we

4    talk about on 22 and 23, are quite relevant and clear in

5    showing a significant disparity.

6        There's another disparity we point out, too, in regard to

7    inpatient hospice care and residential treatment care.  I

8    know that Premera does not want to accede -- agree to the

9    idea that there is any sort of comparison there.  Because

10   obviously inpatient hospice deals with end-of-life.

11       But what you're talking about is the analysis the court is

12   required to carry out, under the final rules of the mental

13   health parity statute.  And that basically says what we're

14   discussing here is a comparison of out-of-network inpatient

15   benefits for mental health and substance use disorders,

16   versus out-of-network inpatient benefits for medical and

17   surgical treatment.

18       I don't have any dispute that the quality of care is

19   different, that the end in mind is different.  But for

20   purposes of an appeal analysis, it's quite clear this court

21   has to find that inpatient hospice falls somewhere on that

22   spectrum of six items, and be compared -- a comparator.  The

23   way we think it compares favorably for us is to say, there's

24   no criteria at all under the Premera plan for how you

25   determine medical necessity of inpatient hospice, where there

1  is, as the court knows, criteria for residential treatment.

2      We've cited a couple of cases for you, Your Honor, the *MS*

3  case, I think is the most prominent one, that says that this

4  is an appropriate comparator.  And, in fact, *MS* dealt with

5  Premera and found, as we're asking this court to find, that

6  there was a violation of the mental health parity statute,

7  based on that inpatient hospice difference.

8          THE COURT:  Do you know whether Premera uses the

9  InterQual criteria to determine medical necessity in the

10  inpatient hospice context?

11          MR. KING:  I do not, no, Your Honor.  I doubt it.  I

12  can't say that.  I'm just not sure, to the extent InterQual

13  -- you know, I'm familiar with InterQual on the mental health

14  and substance use disorder benefit side, not so much on the

15  medical-surgical side.  But my understanding is that Premera

16  has admitted in this litigation that they do not use

17  InterQual in this particular policy for inpatient hospice.

18          THE COURT:  Okay.  You're out of time.  I do have a

19  couple follow-up questions, first.  Do you agree, to find a

20  Parity Act violation, we have to find medical necessity?

21          MR. KING:  Well, I certainly think that medical

22  necessity is a prerequisite to finding benefits available.  I

23  think you can find -- I don't think that you're precluded,

24  Your Honor, from making a finding and a conclusion of law, a

25  declaration, basically, that even setting aside medical

1  necessity, the mental health parity statute has been violated

2  here.

3      Now, what the remedy is, I think is what you're getting at

4  when you ask me that question. What's the proper remedy?

5  That's a fair question.

6          THE COURT: What is the proper remedy?

7          MR. KING: I think the fair remedy is that if we win

8  on the A(1)(b) claim, I'm not looking for any particular

9  relief under the mental health parity claim. But I do think

10 it would be extraordinarily helpful to have this court, as a

11 matter of finding of fact, conclusion of law, state that

12 there has been a violation of the mental health parity

13 statute. And you see, in fact, Judge Parrish, in the

14 *Jonathan Z.* case, doing exactly that.

15         THE COURT: What type of remedy is that? Is that

16 declaratory relief?

17         MR. KING: Yes. And as we develop this area of law,

18 as you know, Your Honor, the mental health parity statute is

19 relatively new, it's developing, it's evolving. I think what

20 we're looking for is courts talking about and identifying, in

21 a way that's helpful for their sister courts down the road,

22 well, was this a violation of the mental health parity

23 statute, or not? I don't know that the remedy is going to be

24 that important, simply because the remedy turns on the

25 individual facts and circumstances of the case.

1          THE COURT:  If you prevail on the Parity Act claim,

2     is there a fee shifter?

3          MR. KING:  Well, there is.  It's the same fee

4     shifting structure that ERISA itself has.

5          THE COURT:  Thank you.  You'll have five minutes for

6     rebuttal.

7          MR. KING:  Thank you.

8          MS. PAYTON:  Thank you, Your Honor.  I might as

9     well -- Gwendolyn Payton for Premera -- pick up where that

10    conversation was.

11        If the plaintiff doesn't have standing because the

12    plaintiff has not been harmed, the plaintiff doesn't have

13    standing to bring -- to have a remedy under the Parity Act.

14    And the claim just fails, because harm is an essential

15    element of the claim.

16        I want to go back and talk about the thing that was really

17    fascinating in your conversation with Mr. King, is, can you

18    look at guidelines that are outside of the administrative

19    record that are in front of you under de novo review?  And I

20    agree, you should review this claim de novo.  I've never seen

21    a court do that, other than when the court has found that the

22    criteria that the plan applied was incorrect.  And that would

23    be like the *Wit* case.  And by the way, I think you know this,

24    Your Honor, *Wit* was overturned by the Ninth Circuit.  And so

25    relying on that district court opinion would probably be a

1    dangerous thing to do at this point.

2            THE COURT:  Does it matter on what grounds they were

3    reversed?  Does the basis for reversal really cut either way

4    on this question?

5            MS. PAYTON:  I think it does cut, because the court

6    was concerned about the level of interference of the district

7    court in the decisions on the medical side.

8         And here -- *Wit* is a very complicated situation.  And it

9    was an ERISA case.  But, you know, they were having experts

10   testify and putting in all this evidence.  It's very, very

11   different.  Here you have InterQual, right?  And nobody is

12   legitimately -- and Mr. King is not arguing that InterQual

13   isn't a widely accepted industry standard.  It's accepted by

14   70 percent of the hospitals and the providers.

15           THE COURT:  I don't think that's in dispute.

16           MS. PAYTON:  Yeah.  So before you would go outside

17   the administrative record and take a look at other criteria,

18   which you could, if you were going to deviate from InterQual

19   or find that InterQual was insufficient, I believe the court

20   should make that finding, before extending outside of the

21   administrative record.

22           THE COURT:  Make what finding?

23           MS. PAYTON:  That InterQual was insufficient.  That

24   the plan was using the wrong criteria.  And there's just no

25   basis to do that here.

1          THE COURT:  Why do you have to make that finding to

2     say that I can look at other criteria, too?  I mean,

3     basically, since this is de novo review, I can look at

4     something that's generally accepted.  It can be InterQual, or

5     it could be something else.

6          MS. PAYTON:  You can look at Milliman, it's on the

7     Internet.  You can find it.  And I think it's in the public

8     record, which you're allowed to look at.

9          And to your point, Your Honor, you actually have very

10     specific evidence on medical necessity and industry

11     standards, generally, in this very record.  Because when you

12     look at the course of this case, it has been looked at three

13     times by a child adolescent psychologist, who looked not only

14     at InterQual, but beyond, to the whole question of medical

15     necessity.  And the administrative story here really answers

16     a lot of your questions.  Because first it's looked at, if

17     the claim isn't submitted until six months after the child

18     has already been at the academy, it's looked at by a child

19     and adolescent psychologist, who determines that it's not

20     medically necessary, based on -- after a certain date --

21     based on the records that are before.

22          And in that communication, invites the family to appeal,

23     if something has been missed, or there is something that they

24     think additional that Premera should consider.  They do.  And

25     that's when the mother writes that lengthy and very

1  thoughtful letter about all of the challenges, submits a

2  number of letters from past providers, and some family

3  friends, and really gives a lot of context about what's

4  happening with the child.

5      Premera then sends it to an independent child and

6  adolescent psychologist, outside of Premera, with all of that

7  information, and with InterQual, and says:  Decide this,

8  based on industry standards and medical necessity.

9      That independent child psychologist determines it's not

10 medically necessary, because the child isn't at the level of

11 severity to require 24/7 monitoring by medical staff, and the

12 provider isn't providing the medical services required under

13 InterQual, which is intake by a psychologist within 24 hours,

14 a treatment plan that is robust, a discharge plan, and that

15 the child actually needs to see the doctor once a week, at a

16 minimum, and have daily clinical analysis.  And it is

17 undisputed that that did not happen here.

18     And then invites the family, if they disagree with the

19 decision on the Level 1 appeal, to go ahead and appeal again,

20 with any new additions.  They don't submit any new

21 information, but they do appeal.

22     Premera sends it to a different independent child and

23 adolescent psychologist, who determines that the care is not

24 medically necessary, for the same reasons, that the child

25 doesn't need 24/7 lockdown care.

1    And we have to remember in these cases, residential

2  treatment is a level of severity which is very intense, in

3  the life of a child, especially here for 14 months, when the

4  child is taken away from the community, from home, from

5  peers, from school.  And to do that, we need to have a

6  finding that the child needs that level of vigilance with

7  24/7 lockdown care.

8    Now, this family was entitled to go to the Insurance

9  Commissioner for a state and federal mandated independent

10  review, that is operated under the auspices of the State

11  Insurance Commissioner in Washington.  And in that process,

12  the Insurance Commissioner will pick a reviewer, and have

13  this looked at again.

14    Now, this family declined to do this.  They didn't exhaust

15  all the administrative remedies available, and instead chose

16  to proceed with this court.

17    But this court has a robust amount of information in this

18  administrative record, both through InterQual, and all of the

19  reviews that have taken place.  There's no question that this

20  claim has received ample due process, and a lot of care and

21  independent analyses to make sure -- to make sure, two

22  things.  One, that the right criteria was applied, that

23  InterQual is correct; and that there was nothing else that

24  needed to be looked at.

25        THE COURT:  I'm still not understanding, though, why

1  I would have to find that it was improper to rely on

2  InterQual, if I look at some other set of standards.  Because

3  the plan just says, you look at these standards -- defines

4  them.  And, sure, it's fine for Premera to look at InterQual.

5  But now that it's a de novo review for the court, why can't I

6  look at something else?

7            MS. PAYTON:  You can look at additional things.

8            THE COURT:  And that qualifies under the language of

9  the plan?

10           MS. PAYTON:  The language of the plan also says we

11  will look at our medical policies that we have in place.  And

12  those medical policies were the InterQual criteria.  And they

13  were available, and they're on the website.

14           THE COURT:  Isn't there something on the record that

15  says that N.C. tried to access them and couldn't find them?

16           MS. PAYTON:  There was a request for them, and they

17  were cited extensively in the record.  I believe they were

18  produced.  There's been no allegation that they didn't have

19  them.

20           THE COURT:  So I could look them up myself on the

21  computer?

22           MS. PAYTON:  Yes.  You can go on to the Premera

23  website and see them.  They're also in the administrative

24  record that is in front of you, in the review file.

25           THE COURT:  You're not saying they're actually part

1   of the plan, are you?

2       MS. PAYTON:  I'm not.  That's a really interesting

3   legal question that we don't have to get into here.  The

4   Honorable James Robart in the *Rust* case found that they were

5   in part of the plan.  Other courts have not.  But there's

6   certainly reference material.

7       Here's the thing about medical policies and InterQual.

8   They're guidelines, right?  Different humans have different

9   needs, at different times, and they -- that's why multiple

10  doctors look at these claims.  And that's why we have a

11  robust review process, to make sure that we are not making a

12  mistake by just uniformly applying a set of criteria.  But

13  they are guidelines that are useful, and they can guide the

14  thinking here.  And there's no reason to think they were

15  inappropriate in this case.

16      So I don't want -- I don't think the court needs to go so

17  far as to say these were contractual terms that needed to be

18  adhered to, because the truth is, we're looking at the

19  totality of the situation.  And under de novo review, you

20  would want to do that to make sure that there was nothing

21  amiss in how this claim -- because these claims are

22  important, right?  This is -- these are people's lives, and

23  they need to have that robust review and analysis.  And the

24  medical guidelines are one part of that.  But everybody is on

25  notice, we're going to use InterQual.  And nobody is arguing.

1    THE COURT:  How are they on notice that you're going

2    to use InterQual?

3        MS. PAYTON:  So if you look in the policy, it says

4    that we're going to review, based on medical policies.  And

5    those are the Premera medical policies that are available for

6    members on the website.

7        THE COURT:  So N.C., you're saying, would have been

8    on notice that the InterQual guidelines would apply?  Those

9    specifically?

10        MS. PAYTON:  Yes, Your Honor.

11        THE COURT:  Where in the record is that?

12        MS. PAYTON:  If you look at the first

13   preauthorization -- when they first submit the claim, not

14   preauthorization, the letter back from Premera has the

15   InterQual guidelines cited, and I think provided to them, and

16   they're citing from the exact language they are looking for.

17   It also comes up in the Level 1 and 2.  And we know the

18   mother is on notice, because she talks at length about the

19   InterQual criteria in her letter.

20        THE COURT:  How about before that time?  Is there any

21   time before that, when she enters into the agreement, that

22   she's told that these guidelines apply?

23        MS. PAYTON:  Yeah.  If you look on the website, there

24   are hundreds and hundreds and hundreds of medical policies,

25   right?  And they could never be incorporated into the

1   contract.  If you go to any carrier website, they'll have the

2   medical policies available, if you want to look at any

3   particular thing.  You know, is there coverage for this type

4   of treatment, or not?  So they are available.  But they're

5   not in the contract itself, if I'm answering your question.

6           THE COURT:  I think you did.

7           MS. PAYTON:  Yeah.  So they're a resource you can

8   get, they're available, if you want.  But, you know, there's

9   no way that those hundreds and hundreds of medical policies

10  would be something that you would send to a member.  But they

11  are available.

12     Like when you bind coverage and you wanted to look at,

13  does this plan cover this certain type of thing, just in the

14  same way you can see on the website who's in the network and

15  who's not; or what are the visit limits and what's not.  So

16  those things are part of the plan, but not in the contract

17  itself.

18          THE COURT:  But you're not saying that N.C. assented

19  to the terms of the InterQual guidelines, right?

20          MS. PAYTON:  N.C. assented to the terms of the

21  medical plan, and the medical plan definition of medical

22  necessity.  And there's no dispute that the InterQual

23  criteria informs what "medical necessity" means, in the

24  context of residential treatment centers.

25          THE COURT:  I hear what you're saying.  If we're on

1   the same page, I hear you saying that the plan has a standard

2   for medical necessity, and the InterQual guidelines satisfy

3   that standard.

4           MS. PAYTON:  Correct.  And you could go the path of

5   the *Rust* case, which finds that they are incorporated into

6   the plan.  But I don't think you need to, because there

7   really isn't a dispute, under any criteria, that this didn't

8   give rise to that level of care.  And, in fact --

9           THE COURT:  Is there any case, besides the *Rust* case,

10  that says there is such incorporation?

11          MS. PAYTON:  No, not that I'm aware of.  I think that

12  when you look, there's a lot of residential treatment center

13  cases.  And we see the courts consistently looking at the

14  medical policies as guidance, both in de novo or

15  discretionary review, for what does medically necessary mean

16  in this case.

17      And to the point of, you know, there are a few cases that

18  find, boy, the medical policy was not right.  And I can think

19  of, like, the *Wit* case was one where the district court did

20  that.  But that's very rare.  And I don't know of any case

21  that rejects InterQual.  I'm just not aware of it.  Mr. King

22  can tell me if there is one.

23          THE COURT:  And, again, not making too fine a point,

24  I'm not talking about rejecting InterQual, I'm talking about

25  a court saying, okay, you applied InterQual, I'm going to

1  apply something else.  Has that ever happened?

2       MS. PAYTON:  No.  I have not ever seen a case like

3  that.  No, I've seen the court say:  Under InterQual, as well

4  as -- but when they say the "as well as," it means they're

5  looking at the review through the administrative process,

6  because often the reviewers are not bound by any particular

7  set of guidelines, they're using their professional judgment

8  and they're going outside the medical policy.

9       But beyond that, no.  But, you know, the main ones, as the

10 court has pointed out, are Milliman and InterQual.  And

11 they're fairly similar.  They don't really deviate too much.

12 They're both going to require the salient issue here, which

13 is:  Do you have a doctor watching the child?  Do you have a

14 doctor look at the state of the child at intake, and make

15 sure this child needs this level of confinement?  And are you

16 tracking the child, on a weekly basis, to make sure this

17 child is still in the medical state to require these things?

18 And if not, it's not medically necessary.  The way that

19 they're laid out is a little bit differently, but they really

20 do come to the same result.

21       THE COURT:  Can you turn to the Parity Act claim?

22       MS. PAYTON: Yeah.

23       THE COURT:  Just a preliminary question.  Does

24 Premera use InterQual criteria to determine medical necessity

25 in the inpatient hospice context?

1    MS. PAYTON:  No, Your Honor.  That's not in the

2    record.  So hospice is different.  They both require that

3    same level of care, with a doctor saying this is appropriate.

4    But hospice is saying:  This person is going to die.  And

5    that is a different analysis than under residential treatment

6    where you do a very complex analysis of the child, because

7    you want the child to get out of the residential treatment,

8    and go on to have a productive life in the community.

9    THE COURT:  You're saying this is apples and oranges?

10   MS. PAYTON:  It is apples and oranges.  And the

11   regulators didn't identify inpatient hospice as an analogous

12   treatment, because hospice is, in truth, where you go to die.

13   And what we don't do is keep analyzing people, are you really

14   dying.  It's just not an appropriate role of the carrier

15   here.

16   But it is appropriate with residential treatment to keep

17   taking a look at, is this continued care necessary.  The two

18   analogous treatments are skilled nursing and rehabilitation.

19   And interestingly, this plan, and including hospice, has more

20   limitations on those medical-surgical interventions, because

21   there are very specific limitations on the amount of time in

22   those services than with the mental health treatment.

23   And you'll see that they really -- the Parity Act was

24   designed to keep people from having more difficult access

25   into the mental health treatment.  And so what the regulation

1   says is, look at the processes by which you put the criteria

2   in place.  And one thing in the record that the plaintiff

3   hasn't talked to you about is -- and it's at 6216 -- you'll

4   see the parity analysis done on this plan.  It is the parity

5   analysis that is submitted to the state and federal

6   regulators to show that a parity was occurring in this plan.

7        And one of the things that they look at is are you

8   requiring a doctor to say that this level of treatment is

9   necessary, or are you requiring a doctor to certify that this

10  continued treatment -- that we're not keeping you here past

11  the point -- and this is the big issue -- that you can't be

12  treated safely and effectively at a lower level of care.

13  Because we know that a lower level of care doesn't mean less

14  care or worse care, it means appropriate care.

15       And all of these treatments have those same processes in

16  place.  There really isn't a legitimate argument that there

17  is any differences here.

18       The Parity Act violations in residential treatment cases

19  tend to arise -- they originally tended to arise where a plan

20  would have skilled nursing, but no residential treatment

21  available at all.  That's not the case here.  And, in fact,

22  residential treatment is available on this plan, actually

23  with no visitation limits at all.

24       There simply isn't a Parity Act claim here.

25            THE COURT:  Is there any scenario under which there

1  would need to be a trial on any factual issue related to the

2  Parity Act claim?

3          MS. PAYTON:  No.

4          THE COURT:  Do you remember when we talked about this

5  at the status conference?

6          MS. PAYTON:  I kind of remember.  I think the parties

7  have agreed that this is suitable for resolution on cross

8  briefing, and nobody has raised any issue of material fact.

9          THE COURT:  Did that agreement arise after that

10 conference?

11         MS. PAYTON:  I think we had already briefed it

12 before, so I would say it was before, we put that position in

13 place.  But nobody has raised an objection.

14         THE COURT:  I'll check with Mr. King.  But my

15 understanding is that at our status conference, you reserved

16 the right to request a trial on issues relating to the Parity

17 Act claim.  So maybe he's withdrawing that.  We'll see what

18 his position is.

19         MS. PAYTON:  We would have expected to hear this now,

20 because we're now on a Rule 56 cross motion, where we have

21 said to you that you can decide this issue as a matter of

22 law.  But more salient, I guess is, what question of fact?

23 The entire record is in front of you.  You have the NQTL,

24 which is the analysis of the parity, in front of you.  There

25 really isn't anything else.  You have the medical policies.

1    And you would have to find that -- from the record in front

2    of you -- that there was some way that people were being

3    discriminated against in the provision of the mental health

4    treatment.  And there simply are no facts in front of you to

5    support that finding.  And it would be novel, given the

6    structure of this plan, and the state of this record.

7        So overall, Your Honor, I'm not sure how much time -- I

8    haven't been --

9            THE COURT:  You have about a minute.

10          MS. PAYTON:  I'll sum up, then.  Congress's intent

11    with ERISA is clear, we want fast, efficient adjudication of

12    claims, to make sure the people are getting the benefits to

13    which they are entitled under ERISA.  ERISA is comprehensive

14    here, where it will take care of this member.  Were you to

15    find that there was something amiss in the way this claim was

16    adjudicated, that member will be made whole, under ERISA.

17        There's no need for a parity claim here, because the only

18    relief that the Parity Act can give is injunctive relief.

19    And the only injunctive relief that these individuals would

20    be entitled to, is the provision of benefits under the plan.

21        There is no ongoing claim that, I need this in the future.

22    And there certainly is no class claim, that other people are

23    entitled to relief.  This is an individual action.  So the

24    plaintiffs are made whole by ERISA.  Under the ERISA claim,

25    there simply is not an issue of material fact that this claim

1  was adjudicated incorrectly.  I don't think that plaintiffs

2  disagree, that under the clear requirements in those

3  InterQual guidelines, that this plaintiff was not receiving

4  the level of care, or meeting the level of criteria required

5  under the plan.  And there is no dispute that this claim got

6  ample due process.  A lot of care.  There was no infirmity in

7  the way that it was done.  It got an independent review,

8  twice, by a child and adolescent psychologist.  There is no

9  reason to overturn this decision.

10       Thank you, Your Honor.

11            THE COURT:  Thank you.  Mr. King?

12            MR. KING:  Thank you, Your Honor.  I'll start kind of

13  in reverse order with the mental health parity analysis.

14  There was -- your question, Your Honor, was:  What's the

15  remedy?  And I neglected to point out, I think the most

16  obvious remedy is if you find that there is a violation of

17  the Mental Health Parity Act, what you should do is strike

18  those criteria that were used in denying the claim, send it

19  back, remand it to Premera, and instruct them:  You need to

20  do analysis of whether those claims should be paid, without

21  using the offending mental health parity criteria that

22  created the disparity between the two.

23       So what we've had in other cases at times in the past,

24  where the courts -- I'm thinking of some of our decisions

25  from down in Utah -- are the court said, in their decision, I

1  find there's a mental health parity violation, but I also

2  find it would be a futile gesture to remand it, because

3  that's not going to result in payment of the claim.

4      That's something, however, in this case, that if you

5  strike the offending mental health criteria that they use

6  that violates the Mental Health Parity Act, you may very well

7  find the claim would be paid on remand.  So that is a remedy

8  that's important.  And that is the thing that creates

9  standing, regardless -- you may say:  I think you lose on the

10  A(1)(b) claim, on the first cause of action, or denied

11  benefit claim.  But what we don't know is, if we struck from

12  your consideration the criteria that violates the mental

13  health parity claim, on remand, whether you would pay the

14  claim or not.  So that's definitely something that creates

15  standing and a meaningful remedy.

16      Your Honor, there is a case -- well, let me talk about

17  another aspect of the mental health parity claim.  That is,

18  the time limits for those skilled nursing facilities.  Your

19  Honor, MHPAEA, the mental health parity statute, is a one-way

20  street.  You can have more restrictive coverage limitations

21  for a skilled nursing facility; that does not preclude more

22  generous coverage for mental health and substance use

23  disorders.

24      What Premera is saying is, well, we have a 14-day limit

25  for skilled nursing facilities.  So, sure, they can say it's

1  a 14-day limit for mental health and substance use disorders

2  in a mental health treatment center.  Not so.

3     What would be offensive to the statute is the reverse,

4  where you have, as Ms. Payton indicated, a prohibition on

5  coverage for residential treatment, with a 14-day limit for

6  residential treatment, and unlimited coverage for skilled

7  nursing facilities.  So I think that's important for purposes

8  of this court's analysis.

9     You asked, Your Honor, about issues of fact and whether we

10  would want to have a trial.  I think that we both do agree

11  that there is sufficient information before the court to

12  justify a ruling in each side's favor, of course, depending

13  on who is arguing, in their favor.

14     However, I do think, Your Honor, that if there are

15  questions in your mind about what generally accepted

16  standards of medical practices are, for purposes of the

17  mental health parity analysis, you could easily say, I think

18  there are issues of material fact, we need a trial, I want to

19  hear experts on this.

20     THE COURT:  Now, but has that train not left the

21  station?  I mean, if that were the case, shouldn't the

22  parties have engaged in expert discovery by this point?

23     MR. KING:  Well, we have not done that, you're right,

24  Your Honor, and that reflects the fact that we have, in our

25  briefing, implicitly presented to you information on our

1   motions for summary judgment that allow you to say, we

2   believe one side or the other side wins on this thing.

3       But if you say:  I disagree with the underlying premise of

4   both of you, I do think there are genuine issues of material

5   fact, I need more information in order to evaluate this, I

6   certainly think that that's within the court's discretion to

7   do.  It's not what we anticipate.  But if that's what the

8   court feels comfortable and necessary to be done to resolve

9   the case, certainly I'm not going to object to that.

10      There is a case, Your Honor, that came down recently from

11  Judge Parrish, and I'll send it to you.  But let me give the

12  cite to you.  It came down a couple weeks ago.  It deals with

13  both benefit recovery and action and this denied benefits

14  claim.

15      *Theo M. v. Beacon Health Options*, 2-19-CV364.  District of

16  Utah.  The Lexis cite is 2022 U.S. Dist. LEXIS 177120.  In

17  that case, Judge Parrish finds that the application of acute

18  care criteria is a violation of the terms of the plan, and

19  justifies payment of benefits.  Also talked about the MHPAEA

20  claim, in passing.  The court -- the decision wasn't on the

21  mental health parity claim.

22      You know, Your Honor, I'm just about out of time.  I don't

23  want to miss something that you feel is important that we

24  discuss.  I'd be happy to answer any questions you have.

25          THE COURT:  I think I'm good at this point.  Are you

1   done with your presentation?

2           MR. KING:  I am.  Thank you.

3           THE COURT:  Counsel, thank you very much for your

4   presentations.  I'll try to get you a ruling as soon as

5   possible.  And we'll be in recess.

6                   (Adjourned.)

7               C E R T I F I C A T E

8

9

10      I certify that the foregoing is a correct transcript from

11  the record of proceedings in the above-entitled matter.

12

13

14

15  */s/ Debbie Zurn*

16  DEBBIE ZURN
    COURT REPORTER
17

18

19

20

21

22

23

24

25