1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| N.C., individually and on behalf of A.C., a minor,<br><br>Plaintiff,<br><br>v.<br><br>PREMERA BLUE CROSS,<br><br>Defendant. | CASE NO. 2:21-cv-01257-JHC<br><br>ORDER |

# I

## INTRODUCTION

This matter comes before the Court on the parties' cross-motions for summary judgment. Dkts. ## 48, 53.  The Court has considered the motions and responses (Dkts. ## 48, 53, 59, 61, 63, 64), the parties' supplemental briefs filed on March 6, 2023 (Dkts. ## 69, 70), the administrative record (Dkts. ## 50, 51, 52), and the applicable law.  Being fully advised, the Court GRANTS Plaintiff's motion in part and awards judgment for Plaintiff on her claim for denial of benefits under 29 U.S.C. § 1132(a)(1)(B).  The Court otherwise DENIES the motions.

## II

### BACKGROUND

Plaintiff N.C. seeks reimbursement for her son A.C.'s 14-month stay at Change Academy Lake of the Ozarks ("CALO") under her contract with Defendant Premera Blue Cross ("Premera") for health care reimbursement.  Plaintiff asserts two causes of action: (1) a claim for recovery of benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), and (2) a claim for violation of the Mental Health Parity and Addiction Equity Act of 2008 ("Parity Act") under 29 U.S.C. § 1132(a)(3).  This order includes additional factual and procedural background information in the findings below.

## III

### DISCUSSION

A.  Plaintiff's Claim for Recovery of Benefits under 29 U.S.C. § 1132(a)(1)(B)

ERISA provides an employee a cause of action for the improper denial of benefits under an employee welfare plan.  *See generally Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948 (9th Cir. 2016).  Cross-motions for summary judgment in the ERISA context are merely a vehicle for deciding the case; the "usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply."  *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

a.   Standard of Review

The Court, in reviewing the administrative record for a plan administrator's denial decision, applies a de novo standard of review unless the plan provides to the contrary.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If the plan grants the administrator "discretionary authority to determine eligibility for benefits," the Court reviews the administrator's decision for an abuse of discretion.  *Id.*  But the plan does not always determine

the issue.  Under ERISA, state laws regulating insurance are saved from preemption and may require de novo review.  *See* 29 U.S.C. § 1144(b)(2)(A).

Here, Washington law requires de novo review.  Wash. Admin. Code § 284-44-015.  The Ninth Circuit has not yet decided how this regulation applies in ERISA cases, but one district court concluded that it "clearly prohibits discretionary clauses in the health care services context."  *Osborn by & through Petit v. Metro. Life Ins. Co.*, 160 F. Supp. 3d 1238, 1246 (D. Or. 2016); *see also Bourland v. Hartford Life & Acc. Ins. Co.*, No. C13–6056 BHS, 2014 WL 4748218, at *1 n.1 (W.D. Wash. Sept. 24, 2014).  And several courts have held that a nearly identical regulation voiding discretionary clauses in disability insurance policies is not preempted by ERISA, making de novo review mandatory for such policies.  *See Murray v. Anderson Bjornstad Kane Jacobs, Inc.*, No. C10–484 RSL, 2011 WL 617384, at *3 (W.D. Wash. Feb. 10, 2011) (upholding and applying WAC 284-96-012); *Landree v. Prudential Ins. Co. of Am.*, 833 F. Supp. 2d 1266, 1274 (W.D. Wash. 2011) (following *Murray*); *cf. Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan, Plan No. 625,* 856 F.3d 686, 694 (9th Cir. 2017) (an insurance regulation can reach discretionary language in plan documents as well as insurer-issued policy).  Here, the parties agree that de novo review applies.  Dkt. # 68 at 4, 16.

On de novo review, the Court conducts a bench trial on the record, and makes findings of fact and conclusions of law based on that record.  *See Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1069 (9th Cir. 1999) (stating that de novo review applies to the plan administrator's factual findings as well as plan interpretation).  A bench trial may "consist[ ] of no more than the trial judge reading [the administrative record]." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999).  Plaintiff bears the burden of establishing entitlement to benefits during the claim period by a preponderance of the evidence, and the Court must evaluate the persuasiveness of the conflicting evidence to make its determination.  *Id.* at 1094–

95. Accordingly, the Court issues these findings of fact and conclusions of law based on a de novo review of the record.[1]

   b.   Findings of Fact[2]

      i.   The Parties

1.   Plaintiffs N.C. and A.C. reside in Middlesex County, Massachusetts.  Dkt. # 1; AR 1193.  N.C. is A.C.'s mother.  *Id.*

2.   At all relevant times, N.C. was a participant in the Plan (a fully insured employee welfare benefits plan under ERISA) and A.C. was a beneficiary of the Plan.  *See, e.g.,* AR 1802.

3.   Premera is an insurance company and admits that it is the claims administrator for the Plan.  Dkt. # 46 at ¶ 2.

      ii.   The Plan Terms and Premera's Medical Policy

4.   The Plan states: "Benefits are available for a service or supply described in this section when it meets all of these requirements: . . . [i]t must be medically necessary." AR 5890.

5.   The Plan defines "Medically Necessary" as:

   Those covered services and supplies that a physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:

   - In accordance with generally accepted standards of medical practice;
   - Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and

---

[1] To the extent any findings of fact may be deemed conclusions of law, they shall also be considered conclusions.  Similarly, if any conclusions as stated may be deemed findings of fact, they shall also be considered findings.  *See In re Bubble Up Delaware, Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982).

[2] The Court notes that the administrative record is extremely disorganized, is not chronologically ordered, and contains many copies of the same documents.  Many documents are incomplete or interrupted by pages of separate documents without explanation.  The Court has done its best to cite the record appropriately.  When a document appears in the record more than once, the Court cites only one appearance of the document.  When the Court references a series of documents in a single citation, it lists them in chronological order instead of page number order.

- Not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer reviewed medical literature generally recognized by the relevant medical community, physician specialty society recommendations and the views of physicians practicing in relevant clinical areas and any other relevant factors.

AR 5949.

6.  "Premera uses medical policies it licenses from an organization called InterQual to determine medical necessity for mental health residential treatments." Dkt. # 48 at 7; AR 59.

7.  The 2019 InterQual guidelines for Child and Adolescent Psychiatry state that continued stay in residential treatment is medically necessary if at least one of these symptoms is present within the last week:

- Aggressive or assaultive behavior
- Angry outbursts
- Depersonalization or derealization
- Destruction of Property
- Easily frustrated and poor impulse control
- Homicidal ideation without intent
- Hypervigilance or paranoia
- Nonsuicidal self-injury
- Persistent rule violations
- Psychiatric medication refractory or resistant and symptoms increasing or persisting, >/ One [one or more symptoms must be present]
    - Anxiety and associated symptom
    - Depressive disorder or major depressive episode and associated symptoms
    - Hypomanic symptom
    - Obsessive or compulsive disorder
    - Psychosis and associated symptom
- Psychomotor agitation or retardation
- Runaway from facility or while on home pass
- Sexually inappropriate
- Suicidal ideation without intent

AR 1724, 1726.[3]

8.  The same InterQual guidelines also state that a patient must exhibit one of these symptoms to meet the criteria for medical necessity:

- o  Interpersonal conflict, >/ One:
    - ▪  Hostile or intimidating in most interactions
    - ▪  Persistently argumentative when given direction
    - ▪  Poor or intrusive boundaries causing anger in others and requiring frequent staff intervention
    - ▪  Threatening
    - ▪  Unable to establish positive peer or adult relationships
- –  Repeated privilege restriction or loss of privileges
- –  Unable or unwilling to follow instructions or negotiate needs
- –  Unresponsive to staff directions or limits

AR 1724, 1725.[4]

9.  The InterQual guidelines state that these interventions must have taken place within the last week for a patient to meet the criteria for medical necessity:

- –  Behavioral contract or symptom management plan
- –  Clinical assessment at least 1 time per day
- –  Individual or family psychoeducation
- –  Individual or group or family therapy at least 3 times per week
- –  Psychiatric evaluation at least 1 time per week
- –  School or vocational program

AR 1724–25.[5]

---

[3] Defendant includes a list of symptoms in its motion for summary judgment that appears to be paraphrased, incomplete, and incorrectly cited when compared to the administrative record.  *See* Dkt. # 48 at 7–8 (citing the administrative record at 1722–23, where no relevant criteria appear). The excerpts closest to its quoted language appear on pages 1724 and 1726 of the administrative record and describe the symptoms that must be present either on "Episode Day 2–15" or "Episode Day 16–X, Extended Stay" for a patient to meet the "medical necessity" criteria for continued stay at a residential treatment center.

[4] Defendant's citation here is similarly unhelpful.  *See* Dkt. # 48 at 8 (citing AR 1722–23, where no relevant criteria appear).  The excerpts closest to its quoted language describe the symptoms that must be present either on "Episode Day 2–15" or "Episode Day 16–X, Extended Stay" for a patient who is experiencing a serious emotional disturbance to meet the "medical necessity" criteria for continued stay at a residential treatment center.

[5] Defendant cites additional required interventions such as "Psychiatric evaluation, initial within 1 business day" and "Preliminary discharge plan initiated within 24 hours" that the Court cannot locate in the text of the guidelines.  *See* Dkt. # 48 at 8 (citing the administrative record at 1723–24, where this language does not appear).

10.  The InterQual guidelines are not included with or attached to the Plan documents.  *See generally* AR.

### iii.   A.C.'s Developmental and Medical History

11.  A.C. was born in Guatemala in 2004 and lived there until N.C. adopted him when he was a little over a year old.  AR 4937.

12.  A.C.'s older sister K.C. was adopted as well, and she is from Cambodia.  AR 4941.  K.C. had significant behavioral issues throughout her childhood.  *Id.*  She was later diagnosed with generalized anxiety disorder, major depressive disorder, post-traumatic stress disorder, and autism spectrum disorder.  *Id.*  As a child A.C. was often exposed to his sister's violent tantrums, which included biting, kicking, spitting, and hitting.  AR 4938.  On at least one occasion K.C. was physically aggressive toward A.C.  *Id.*

13.  Unbeknownst to N.C., an older family friend sexually abused A.C. for about two years when he was a child.  *Id.*  A.C. did not disclose the abuse until years later.  *Id.*

14.  A.C.'s behavior and functioning began to seriously decline in about 2016.  AR 4939.  He would often lash out physically and orally toward his sister and mother.  *Id.*  He also stopped attending school regularly, showed signs of depression, struggled with self-care, and talked about killing himself.  AR 4939–40.

15.  A.C.'s symptoms continued to escalate until the police became involved.  In one instance in 2017, he called the police himself and told them that he did not feel safe; he was then transported to an emergency room.  AR 986; 988.  On another occasion in 2019 he threatened to punch his mother in the face.  AR 983, 4940.  *Id.*  She called the police and A.C. was hospitalized.  *Id.*; AR 1005–1006.

16.  A.C. saw several therapists and psychiatrists throughout his childhood and adolescence, including most recently Amber Haines, LICSW (who he saw for outpatient therapy), and Marcus

Favero, M.D. (who he saw for medication management).  Dkt. # 4938–39.  Although A.C. connected with some of them at first, none managed to make successful interventions.  *See, e.g.*, AR 771.

17.   In October 2018, Brian Willoughby, Ph.D., diagnosed A.C. with attention deficit hyperactivity disorder (ADHD), major depressive disorder (MDD), and unspecified anxiety disorder (with symptoms of generalized anxiety, PTSD, and social anxiety).  AR 992.

18.   A.C. was prescribed several medications to manage his mental health diagnoses over the years, including Seroquel, Concerta, Ritalin, Prozac, Klonopin, and Zoloft.  AR 994, 1006, 4943. These medications seemed to improve some symptoms but not others.  AR 4943.

19.   In April 2019, at the suggestion of A.C.'s psychiatrist at the time, his mother placed him on a waitlist for an inpatient program.  When she explained this to A.C., he become angry and violent, and threatened to punch her.  AR 983, 4940.  N.C. called the police and A.C. was taken to the emergency department of Emerson Hospital.  *Id.*; AR 1004.

20.   A.C. was transferred to a community-based acute treatment (CBAT) program at Franciscan Children's Hospital, where he stayed from April 4 to 18, 2019.  AR 1007.  His medical records from the CBAT program state that he was admitted due to increased depression, anxiety, aggression at home, and endorsing suicidal ideation.  AR 1008.  His diagnoses are listed as "Post-Traumatic Stress Disorder, developmental trauma and acute trauma; Attention-Deficit/Hyperactivity Disorder, Unspecified, per history; Generalized Anxiety Disorder; Unspecified Depressive Disorder; Reactive Attachment Disorder."  AR 1010.

21.   Following this stay, A.C. was admitted to a therapeutic wilderness program called New Vision.  AR 1020.  His treatment records state, "[A.C.] was originally referred [to New Vision] by CALO-Change Academy of Lake of Ozarks to complete time in wilderness for initial stabilization before his enrollment at CALO."  AR 1022.  His treatment recommendations from

New Vision state, "a return to his home setting or another setting without a robust therapeutic program would cause significant regression … The next placement for [A.C] needs to be individualized and structured to provide him the support academically and within his peer group." AR 1026.

### iv.   CALO

22.   CALO is a residential treatment facility located in Lake Ozark, Missouri.  AR 789, 882. At all relevant times, it was licensed by the State of Missouri Department of Social Services Children's Division as a Residential Treatment Agency for Children and Youth.  AR 788–89.  It was also a Joint Commission accredited facility.  AR 5073.

23.   A.C. applied for admission to CALO on April 11, 2019, before he enrolled in New Vision.  AR 3513.

24.   In preparation for his admission, CALO conducted a psychosocial assessment of A.C. on April 23, 2019.  AR 4937.  The assessment included sections entitled, "General Information," "Psychiatric and/or Psychological Evaluation," "Treatment History," "Psychosocial Assessment," "Unsafe Behaviors Overview," "Family Overview," "Educational/Academic History," "Strengths/Weaknesses/Social Interaction History," and "Medication Review." *Id.*

25. A.C. was admitted to CALO on June 18, 2019.  AR 4926.

26.  Upon admission, CALO created an "Initial Treatment Plan" for A.C.  *Id.*  The Initial Treatment Plan outlines the reasons for A.C.'s admission, including a statement that "[A.C.]'s psychiatrist feels a residential placement is appropriate at this time."  *Id.*  It also includes sections on "Initial Student Care Needs," the results of a "Mental Status Exam," "Perceptions of Strengths and Weaknesses," "Perception of Placement," "Parent/Family Educational Needs," "Initial Treatment Objectives," and "Initial Treatment Care Interventions." *Id.* at 4927.  It was

signed by four treatment team members in September 2019, but the document appears to have been created on June 18, 2019.  AR 4926–27.

27.  During his stay at CALO, A.C. participated in individual therapy, group therapy, family therapy, milieu therapy, alpha stim therapy, and canine therapy.  *See generally* AR 1243–4956. He met with clinical staff on average daily and with a psychiatrist on average weekly.  *Id.*

28.  A.C. was discharged from CALO on August 23, 2020.  AR 1965.

v.  Plaintiff's Claim for A.C.'s Treatment and Premera's Denial

29.  On August 9, 2019, N.C. submitted a claim for reimbursement to Premera for A.C.'s residential treatment at CALO for the period beginning on June 18, 2019.  AR 5991.

30.  On September 3, 2019, Premera agreed to pay for nine days of A.C.'s stay at CALO but denied the claim for reimbursement after June 26, 2019.  AR 44, 5992–5995.

31.  Premera's denial letter states:

Our decision: The Treatment guidelines we use state that continued residential treatment for a mental health condition is medically necessary when, because of a serious emotional disturbance, the following situations are true for you:

- Within the last week, one of these is true for you:
    - You have been having angry outbursts
    - You have hurt or tried to hurt others or have thoughts about killing others
    - You have hurt yourself or have thoughts about killing yourself
    - You have destroyed property, or you are having other very serious psychiatric symptoms
- OR, your symptoms have improved, discharge is planned within the next week, and either some treatment goals have not been met that will be met within the next week, or more work is needed with your family before you go home that will be done within the next week.
- AND, within the last week, one of these is also true for you:
    - You have very bad relationships with other people
    - You are interacting with others in very angry or threatening ways
    - You can't or won't follow instructions or ask for help to get your needs met.
- OR, your functioning has improved, discharge is planned within the next week, and passes are planned within the next week to help you get ready to go to another level of care.

Continued residential treatment for mental health condition is denied as not medically necessary after 6/26/19.  Information from your provider does not show any of the situation above on and after 6/26/19.

The treatment guidelines we use also state that, in addition to other requirements, continued residential treatment for a mental health condition is medically necessary only when a psychiatric evaluation was done within one business day of admission, and is then being done at least one time per week (every 7 days), by a psychiatrist, psychiatric nurse practitioner, or psychiatric physician assistant, and when an individualized goal-directed treatment is completed within 1 weeks after admission. The information from your provider does not show any psychiatric evaluations by a psychiatrist, psychiatric nurse practitioner, or psychiatric physician assistant, after 6/26/19, and shows that the first treatment plan was not completed until more than 6 weeks after admission.

What is the decision based on?  We reviewed your contract, Change Healthcare InterQual Criteria, BH: Child and Adolescent Psychiatry InterQual 2019, and the medical records your provider, Change Academy at Lake of the Ozarks, sent to us.  We have determined this service is considered not medically necessary.

AR 43.

### vi.   Plaintiff's Level I Appeal

32.  Plaintiff at first attempted to submit an appeal of Premera's denial of coverage through Premera's internal appeal process ("Level I Appeal") on February 24, 2020.  AR 3.  But Premera did not receive the mailing and requested that N.C. resubmit her appeal.  *Id.*  N.C. resubmitted her appeal on July 6, 2020, and it was received by Premera.  AR 2.  Premera considered the appeal to be timely given N.C.'s genuine effort to timely appeal.  AR 3.

33.  Plaintiff made four arguments in her Level I Appeal.  First, she argued that Premera relied on faulty rationale in denying coverage because its "intensity of services" requirements— such as the requirement that A.C. meet with a psychiatrist, psychiatric nurse practitioner, or psychiatric physician assistant within one business day of admission and then at least one time per week thereafter—were false, misleading, and arbitrary.  AR 16.  She emphasized that A.C.

met with a psychiatrist "as often as is clinically indicated, at times as frequently as every four to six days.  In fact, over the course of his stay, [A.C.] has met with Dr. Nair an average of once per week." AR 16–17.  Second, she argued that Premera's intensity of service denial violated the terms and conditions of the Plan because it based its coverage decision on its own internal policies instead of the Plan language.  *Id.* at 17.  She pointed out that, according to the Plan, covered services may be rendered by "[a]ny other provider listed under the definition of 'provider' . . . who is licensed or certified by the state in which the care is provided, and who is providing care within the scope of his or her license," *Id.* (citing AR 780), and that the Plan defines "providers" as "health care practitioners and facilities licensed or certified consistent with the laws and regulations of the state in which they operate, and provide health care services consistent with applicable state requirements."  AR 17.  Third, she argued that the InterQual guidelines violate generally accepted standards because they (1) place inappropriate emphasis on acuity and crisis stabilization over effective treatment, AR 19–20, and (2) fail to consider complex diagnoses and the need for specialized treatment for individuals like A.C.  *Id.* at 20. Fourth, she argued that Premera violates federal mental health parity regulations, namely the MHPAEA, because it imposes more stringent coverage requirements in the context of mental health than in the context of medical and surgical care.  AR 22.

34.  N.C. included several exhibits with her Level I Appeal in support of her arguments that A.C.'s treatment at CALO was medically necessary, including the Plan documents, A.C.'s medical records, letters of medical necessity from A.C.'s treatment team, and many other documents.  *See generally* AR 1–1613.

35.  Premera denied Plaintiff's Level I Appeal on July 29, 2020.  AR 1801.  The denial letter states:

> As of June 27, 2019, [A.C] was not wanting to harm himself or others. He was able to care for his daily needs and was not hearing or seeing things that were not there. [A.C] was participating in treatment and did not have any severe depressive symptoms that require around the clock nursing supervision. [A.C] could have been safely managed in a less restricted setting. Therefore, the claims for services after this date are denied.

AR. 1801. Premera also attached an "Independent Medical Review" completed by a child and adolescent psychiatrist. That report states:

> As of 6/27/19 the patient was not reported to be suicidal, homicidal, or gravely impaired for self-care. There was no report of self-harm. He was not actively aggressive. The patient was able to care for his daily needs. He did not report any auditory or visual hallucinations. The patient was compliant with treatment and was attending family and individual therapy sessions. The patient continued to make progress to the point that could have allowed him to be treated in a lower level of care. He was not psychotic, delusional, or manic. He did not have any severe depressive symptoms that required 24-hour nursing supervision. From the clinical evidence, the patient could have been treated in a lower level of care such as partial hospitalization.

AR 1949. The report also included CALO treatment notes from six treatment dates ranging from 6/27/19 to 10/30/19, seemingly as support for the ultimate conclusion that A.C.'s stay at CALO was not medically necessary after June 27, 2019. *Id.*

### vii.   Plaintiff's Level II Appeal

36. On August 27, 2020, Plaintiff submitted a Level II Appeal. AR 1965. In her appeal, she first asserted that she had not been afforded a full and fair review because Premera had not addressed several of the arguments she raised in her Level I Appeal. AR 1966–68. Second, Plaintiff reiterated her arguments about Premera's failure to comply with the Parity Act, specifically referencing the InterQual criteria for Skilled Nursing Facilities. AR 1968–69.[6] Lastly, Plaintiff disputed Premera's determination that A.C.'s stay at CALO was not medically necessary, highlighting the letters of medical necessity that she had submitted with her Level I

---

[6] Plaintiff also attached the InterQual criteria for Skilled Nursing Facilities.

Appeal.   AR 1970–81.  She also requested that her Level II Appeal be reviewed by someone who is board certified in child and adolescent psychiatry and who has experience treating adolescents diagnosed with major depressive disorder (MDD), attention deficit/hyperactivity disorder (ADHD), reactive attachment disorder (RAD), and post-traumatic stress disorder.  AR 1967.

37. Premera denied Plaintiff's Level II Appeal on September 21, 2020.  AR 4249.  The denial letter states:

> Your request was denied based on a review of the clinical information submitted. [A.C.] does not meet medical necessity criteria for residential level of care from 6/27/2019 forward.  [A.C] has no dangerous psychiatric behaviors, comorbid medical problems, withdrawal symptoms or other gross dysfunction that would necessitate this level of care. It appears that he could be cared for at a lower level of care during this time. Kupfer and colleagues as well as Davidson highlight treatment options for major depression and it appears that these could be utilized at a lower level of care in this case from the above-mentioned dates forward.

*Id.*

38. When asked to give a justification for the denial in layperson's terms, "addressing each argument that the claimant raised," the reviewers wrote:

> You do not meet criteria for residential level of care from 6/27/2019 forward. You do not have any active plans to end your life or others.  You do not have any medical problems.  You are not withdrawing from drugs.  As such, the request is not approved.

AR 4246.

### viii.   Procedural Background

39. Plaintiff filed this action on July 29, 2021.  Dkt. # 2.

40. The parties cross-moved for summary judgment on July 7, 2022.  Dkts. ## 48, 53.

41. The Court held oral argument on October 24, 2022, and took the matter under advisement.  Dkt. # 66.

1    42. On February 27, 2023, the Court ordered the parties to provide supplemental briefing

2    about which medical necessity guidelines it should look to and why.  Dkt. # 67.  The parties

3    responded with supplemental briefs on March 6, 2023.  Dkts. ## 69, 70.

4         c.   Conclusions of Law

5              i.   Jurisdiction

6    1.   The Court has jurisdiction over this case under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. §

7    1331.

8              ii.   Standards under ERISA

9    2.   As discussed above, the Court reviews the record de novo.  *See Rorabaugh v. Cont'l Cas.*

10   *Co.*, 321 F. App'x. 708, 709 (9th Cir. 2009).  "When conducting a de novo review of the record,

11   the court does not give deference to the claim administrator's decision, but rather determines in

12   the first instance if the claimant has adequately established" her claim "under the terms of the

13   plan."  *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010).

14   3.   When a district court reviews a plan administrator's decision under the de novo standard

15   of review, the burden of proof is on the claimant to show entitlement to benefits.  *Id.* at 1294.

16   4.   "Under de novo review, the rules ordinarily associated with the interpretation of

17   insurance policies apply."  *Leight v. Union Sec. Ins. Co.*, 189 F. Supp. 3d 1039, 1047 (D. Or.

18   2016) (citing *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125

19   F.3d 794, 799 (9th Cir. 1997)).  Accordingly, the Court construes any ambiguities in the Plan

20   against Premera and is required "to adopt [a] reasonable interpretation advanced by [the

21   insured.]"  *See Lang*, 125 F.3d at 799.

22             iii.   InterQual Guidelines

23   5.   Premera argues that its use of the InterQual guidelines is "in accordance with the plan

24   booklet."  Dkt. # 48 at 7.  Specifically, it points to the language: "Our policies are based on

ORDER - 15

accepted clinical practice guidelines and industry standards accepted by organizations like the American Medical Association (AMA), other professional societies and the Center for Medicare and Medicaid Services (CMS)."  AR 5890.

6.   The Court agrees that Premera's use of the InterQual guidelines was "in accordance with the plan booklet," in that the InterQual guidelines are not inconsistent with generally accepted standards of practice.  *See, e.g.*, *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 852 F.3d 105, 114 (1st Cir. 2017) (holding, under an abuse of discretion standard of review, that "BCBS reviewers reasonably consult the InterQual Criteria, which are nationally recognized, third-party guidelines").

7.   But on de novo review, the question is not whether Premera's use of the InterQual guidelines was reasonable.  The Court needs to rely on the InterQual guidelines only if they are incorporated into the Plan as a governing legal document.  *See, e.g.*, *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1261 (3d Cir. 1993) ("[C]ourts have refused to rely exclusively on particular third-party classifications where the plan has not explicitly referenced them. . . ."); *Pirozzi v. Blue Cross-Blue Shield of Va.*, 741 F. Supp. 586, 591 (E.D. Va. 1990) (refusing to uphold coverage denial based on health plan's internal "technology evaluation criteria" because "the criteria are not part of the Plan and the Plan nowhere states that the Blue Cross criteria are determinative of a treatment's experimental status").  Premera does not argue that the Plan incorporates the InterQual guidelines, instead emphasizing that its use of the guidelines was "in accordance" with the Plan language (Dkt. # 48 at 7) and citing cases in which courts have found that the "InterQual criteria are nationally recognized, third-party guidelines designed to help healthcare organizations assess the safest and most clinically appropriate care level for more than 95% of reasons for admission."  Dkt. # 48 at 13 (citing *Julie L. v. Excellus Health Plan, Inc.*, 447 F. Supp. 3d 38, 43, n.3 (W.D.N.Y. 2020) (internal citations omitted)); *see also* Dkt. # 59 at 5-6.

1      Lastly, Premera conceded in oral argument that the InterQual guidelines are not incorporated by

2      reference into the Plan.  Dkt. # 68 at 23–25.

3            8.   The Court concludes that the InterQual guidelines are not incorporated by reference into

4      the Plan, and therefore represent only one source of potentially relevant authority on whether

5      A.C.'s treatment was medically necessary.  The Court is not bound to rely exclusively on these

6      guidelines and may consult alternate sources of evidence and authority.  *See Heasley*, 2 F.3d at

7      1261.

8            9.   The Court also notes that although Premera's use of the InterQual guidelines may have

9      been "in accordance with the plan booklet," its decision to exclude coverage based on Plaintiff's

10     failure to meet these extraneous and rigid standards—which are not explicitly referenced in the

11     Plan language—is troubling.  The Ninth Circuit has adopted the "reasonable expectations"

12     doctrine when interpreting ERISA contracts, which provides that "[i]n general, courts will

13     protect the reasonable expectations of applicants, insureds, and intended beneficiaries regarding

14     the coverage afforded by insurance carriers even though a careful examination of the policy

15     provisions indicates that such expectations are contrary to the expressed intention of the insurer."

16     *Saltarelli v. Bob Baker Grp. Med. Tr.*, 35 F.3d 382, 386 (9th Cir. 1994) (citing Robert E. Keeton

17     & Alan I. Widiss, *Insurance Law: A Guide to Fundamental Principles, Legal Doctrines, and*

18     *Commercial Practices* § 6.3 (West 1988)); *see also Kunin v. Benefit Tr. Life Ins. Co.*, 910 F.2d

19     534, 540 (9th Cir. 1990) (In the context of interpreting ambiguous provisions of an ERISA

20     contract, "the insurer should be expected to set forth any limitations on its liability clearly

21     enough for a common layperson to understand.").  Because the Court reviews this case de novo,

22     it must interpret the governing plan documents without deferring to any party's interpretation,

23     *see Bruch*, 489 U.S. 101, 112–13 (1989), and the reasonable expectations doctrine weighs

24     against using exclusively the InterQual guidelines to define "medical necessity."

ORDER - 17

10. Lastly, the Ninth Circuit has held that the doctrine of *contra proferentem*, which mandates that ambiguous contract terms be construed against the insurer, applies to ERISA cases. *Kunin*, 910 F.2d at 540.   Thus, if there are any ambiguous terms in the Plan language, the Court will err on the side of Plaintiff's proposed construction (and against strict application of the InterQual guidelines). *See id.* ("an insurer's practice of forcing the insured to guess and hope regarding the scope of coverage requires that any doubts be resolved in favor of the party who has been placed in such a predicament").

iv.   Medical Necessity

11. In deciding whether the Plan covers A.C.'s treatment at CALO, the Court begins with the Plan's language. *See Bruch,* 489 U.S. at 112–13 (In an ERISA case in which the standard of review is de novo, courts should review the insured's claim "as it would have any other contract claim—by looking to the terms of the plan and other manifestations of the parties' intent."); *cf. Waller v. Truck Ins. Exch., Inc*., 11 Cal. 4th 1, 18, 44 Cal. Rptr. 2d 370, 900 P.2d 619 (1995) ("The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it.").

12. The Court concludes that the only ambiguity in the Plan's definition of medical necessity is the phrase, "generally accepted standards of medical practice."  Although the plan does further define the term as "standards that are based on credible scientific evidence published in peer reviewed medical literature generally recognized by the relevant medical community, physician specialty society recommendations and the views of physicians practicing in relevant clinical areas and any other relevant factors," AR 5949, even this more specific definition is susceptible to multiple interpretations.  Indeed, neither party argues that the InterQual guidelines are the *only* standards that meets this definition, and Plaintiff advocates for the application of the AACAP

standards instead.  The Court therefore concludes that it must look to sources of authority outside the Plan language to properly define this term.  Except for this phrase, the Plan language defines "medical necessity" with sufficient clarity that the Court need not consult extraneous guidelines.  *See generally Health Cost Controls v. Isbell*, 139 F.3d 1070, 1072 (6th Cir. 1997) ("A primary purpose of ERISA is to ensure the integrity and primacy of the written plans" (citing *Duggan v. Hobbs,* 99 F.3d 307, 309–10 (9th Cir. 1996)).  The Court consults the American Academy of Child and Adolescent Psychiatry's (AACAP) "Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers" (Principles of Care) and "Practice Parameter for the Assessment and Treatment of Children and Adolescents with Reactive Attachment Disorder and Disinhibited Social Engagement Disorder" (RAD Practice Parameter), the InterQual guidelines,[7] and the remaining record evidence in clarifying the meaning of these phrases in the contract.

13. Plaintiff urged application of the AACAP standards in her administrative appeal and her motion for summary judgment.  AR 20; Dkt. # 53 at 19–21.  Defendant also addressed these standards in its opposition brief, arguing that the Court should not use the AACAP Principles of Care because "[e]xamination of this entire document reveals that its purpose is not to establish a policy or standards for determining when residential treatment is medically necessary.  Rather, as the title itself states, the document's purpose is to establish a standard of care for treatment at a residential treatment centers."  Dkt. # 59 at 6–7.

---

[7] The Court's analysis is informed by the InterQual guidelines, but it rejects Defendant's argument that it must adhere to their rigid requirements for frequency of symptoms and interventions in determining medical necessity.  Both parties agree that the InterQual guidelines are not meant to be the exclusive source of authority in determining medical necessity; they state themselves that they "are intended solely for use as screening guidelines with respect to the medical appropriateness of health care services and not for final clinical or payment determinations concerning the type or level of medical care provided, or proposed to be provided, to a patient."  AR 21 (citing *InterQual Procedures Criteria: Review Process*, Change Healthcare LLC, 2019, p. 1); Dkt. # 61 at 9; Dkt. # 64 at 4.  The Court therefore consults them but does not rely exclusively on them in coming to its conclusions.

14. Defendant's argument overlooks a key distinction.  As discussed above, the Court is not using the AACAP standards to define "medical necessity" as a whole; rather, the Court consults the AACAP standards only to help define "generally accepted standards of medical practice." The rest of the Plan's definition of "medical necessity" is sufficiently clear that the Court need not consult external standards to determine whether residential treatment was warranted for this Plaintiff.  Defendant's own argument concedes that the AACAP standards are intended to "establish a *standard of care*" (emphasis added) for residential treatment centers, and it does not otherwise argue that these documents are not "based on credible scientific evidence published in peer reviewed medical literature generally recognized by the relevant medical community, physician specialty society recommendations and the views of physicians practicing in relevant clinical areas and any other relevant factors."  *See* AR 5949; Dkts. ## 59, 64, 69.

15. The Court's reliance on the plain language of the Plan, except when ambiguities require reliance on outside sources, conforms with general principles of contract construction and the rule in *Bruch*.  *See also Saltarelli*, 35 F.3d at 386 (*citing Menhorn v. Firestone Tire & Rubber Co.,* 738 F.2d 1496, 1500 (9th Cir.1984) ("The courts are directed to formulate a nationally uniform federal common law to supplement the explicit provisions and general policies set out in ERISA, referring to and guided by principles of state law when appropriate, but governed by the federal policies at issue.").

v.  Plaintiff is entitled to benefits

16. The preponderance of the evidence establishes that A.C.'s 14-month stay at CALO was medically necessary.  First, all of the mental health professionals who actually examined or treated A.C. found that his symptoms could not be safely managed at home, and that he required the structure of a residential treatment center to engage in effective therapeutic interventions.

Marcus Favero, M.D., the psychiatrist who treated A.C. for over two years until April 2019 (just

before his last hospitalization, wrote:

> …[A.C.] was challenging to treat due to his hostility, distrust and inability to
> tolerate discussion about his functional difficulties and psychiatric symptoms.
> Trials of several different antidepressants, mood stabilizers and stimulants (for
> ADHD) appeared to be only marginally helpful.  In the last several months in
> which he was my patient, he dropped out of outpatient psychotherapy and started
> refusing to see me as well…

> …[A.C.]'s mother kept in close contact with me during the early spring of 2019
> as his condition continued to deteriorate.  I recommended she work towards
> hospitalization for shorter-term stabilization, and I consulted to Emily Buck,
> PMHNP-BC, the psychiatric nurse practitioner in charge of his care during his
> hospitalization at Franciscan Children's Hospital in April 2019.  *My assessment at
> that time was that neither outpatient nor short term acute treatment were
> sufficient to meet his needs.  Due to his chronic and deteriorating symptom
> picture, increasing dysfunction at school and home, hostility and/or complete
> withdrawal in relationships, and concerns related to his and others' safety, I
> concluded that he met medical necessity criteria for long term residential
> treatment and recommended this course be pursued…*

AR 771 (emphasis added).  Similarly, Emily Buck, the Nurse Practitioner who treated A.C. at the

Franciscan-McLean Community Based Acute Treatment (CBAT) program from April 4 to 18,

2019, wrote, "in developing a safe discharge plan for [A.C] . . . with his mother, we discussed

the potential benefits of a therapeutic residential program."  AR 769.  And upon A.C.'s discharge

from New Vision, Field Therapist Claire Vos, MS, LPC, wrote that "a return to his home setting

or another setting without a robust therapeutic program would cause significant regression and

the return of [A.C]'s negative coping strategies."  AR 1026.  A.C.'s treatment team at CALO

also found that he required continued residential treatment to properly manage and treat his

symptoms.  His treating psychiatrist Dr. Nair tracked his symptoms and medications through

weekly visits, and repeatedly recommended that he "continue residential treatment."  *See, e.g.*,

AR 472, 3000, 446, 406, 384.  Similarly, his treatment team (including his treating psychiatrist,

therapist, and other CALO staff) created monthly treatment plans where they documented his

diagnoses and set dates for the anticipated completion of therapeutic goals before discharge.  *See* AR 4926, 424, 358, 238, 119, 5743, 5665, 1289, 2128, 4180, 4026, 3887, 3757, 3679.  And A.C.'s treating therapist, Chris Austin, M.A., L.P.C., N.C.C., continued to document "symptoms and behaviors demonstrating the continued need for RTC [residential treatment center] level of care," *see, e.g.*, AR 3858, 3848, 3805, 3747, 3722, 3708, 3689, 3636,[8] through A.C.'s last months at CALO.  This evidence shows that A.C.'s stay at CALO was within the category of services that a physician, "exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, disease or its symptoms."  AR 5949.

17. The Court notes that Premera also provided an Independent Medical Review, completed by a child and adolescent psychiatrist, with its Level I denial letter.  AR 1949.  But the analysis references only six treatment dates between June 27, 2019, and October 30, 2019, appears cursory, and focuses on several acute symptoms (such as suicidality and homicidality) that are emphasized in the InterQual criteria.  *Id.*[9]  For the reasons articulated above, the Court declines to rigidly apply the InterQual criteria in determining medical necessity.  It also gives greater weight to the opinions of the providers who actually treated and examined A.C. than to physicians who simply reviewed the file.  *See Holmgren v. Sun Life & Health Ins. Co.*, 354 F.

---

[8] These symptoms and behaviors included (1) "functional impairments" such as "impaired social relationships," "inability to live without support," "inability to maintain health relationships with peers or adults," "lacks independent living skills," and "inability to manage interpersonal conflict," (2) "limitations in home support" such as "lower levels of care failed to alleviate the symptoms" and "was a witness or target of physical, sexual, or emotional abuse," (3) "mood symptoms" such as anxiety, apprehension, feelings of worthlessness, hyper vigilance, difficulty sleeping, excessive worry of abandonment, and irritability, (4) "personality symptoms" such as "lacks close friends" and "provocative behaviors," and (5) "physical symptoms" such as excessive energy/fidgeting, preoccupation with body image and unstable relationships, and hyper-vigilance/paranoia.  *Id.*

[9] Premera's Level II denial letter similarly states that A.C.'s case was reviewed by a "Physician Reviewer who is board-certified in Psychiatry, and who has experience in reviewing health plan appeals," and focuses on symptoms that are emphasized in the InterQual guidelines such as "dangerous psychiatric behaviors."  AR 4249.

Supp. 3d 1018, 1030 (N.D. Cal. 2018) (citing *Salomaa v. Honda Long Term Disability Plan*, 642

F.3d 666, 676 (9th Cir. 2011)); *cf. Smith v. Hartford Life & Acc.*, 2013 WL 394185, at *23 (N.D.

Cal. Jan. 30, 2013) (Deference to treating providers is particularly warranted in mental health

cases because, "'[u]nlike cardiologists or orthopedists, who can formulate medical opinions

based on objective findings derived from clinical tests, the psychiatrist typically treats [their]

patient's subjective symptoms.'") The Ninth Circuit has cautioned that "complete disregard for a

contrary conclusion without so much as an explanation raises questions about whether an

adverse benefits determination was the product of a principled and deliberative reasoning

process." *Salomaa*, 642 F.3d at 679 n.35 (internal quotation omitted); *see also Montour v.

Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635 (9th Cir. 2009) (complete disregard for Social

Security Administration opinion, without explanation, suggested failure to engage in principled

reasoning and failure to consider relevant evidence in disability determination).

18. Premera seems to agree with A.C.'s providers that his admission to CALO was medically

necessary, because it covered the first nine days of his stay.  AR 44, 5992–5995.  But it refused

to cover his stay after June 26, 2019, seeming to imply—based on its own logic—that there was

some change to the acuity of his symptoms after that date.  But a thorough review of A.C.'s

medical and therapeutic records during his stay at CALO reveal that there was no meaningful

change in his symptoms after June 26, 2019.  He continued to display verbal aggression[10] and

---

[10] AR 619, 615, 3134, 528, 507, 419, 4669, 390, 357, 170, 2691, 1528, 1263, 1239, 1258, 1257, 1256, 2224, 1245, 2215, 2210, 2209, 2208, 2198, 2195, 2188, 2186, 2185, 2176, 2172, 2166, 2100, 4216, 4214, 4213, 4212, 4211, 4206, 4188, 4173, 4170, 4169, 4165, 4154, 4155, 4145, 4142, 4140, 4139, 4128, 4125, 4123, 4121, 4094, 4093, 4092, 4081, 4075, 4069, 4068, 4065, 4063, 4037, 4036, 4008, 4004, 4003, 3992, 3958, 3953, 3952, 3941, 3939, 3933, 3922, 3921, 3919, 3912, 3903, 3901, 3899, 3898, 3894, 3877, 3872, 3871, 3856, 3850, 3852, 3849, 3844, 3809, 3810, 3808, 3807, 3806, 3795, 3793, 3791, 3787, 3783, 3782, 3780, 3752, 3750, 3749, 3748, 3744, 3737, 3792, 3690, 3687, 3683, 3642, 3641, 3640, 3639, 3637, 3633, 3626, 3625, 3623, 3622, 3621, 3576, 3575, 3573, 3571; *cf.* AR 1724 (InterQual guidelines: "aggressive or assaultive behavior").

physical aggression[11] toward staff, issues with relational engagement such as self-isolation[12] and refusal to follow basic instructions,[13] and hypervigilance or high threat sensitivity[14] throughout his stay (and including during his final months at CALO).  The evidence thus does not suggest that A.C.'s symptoms were resolved by June 26, 2019, but rather—as his treating providers concluded—that he continued to require a structured therapeutic environment through August 2020.[15]  *See, e.g.*, *Daniel B. v. United Healthcare*, No. 2:20–cv–00606–DBB–CMR, 2022 WL 4484622, at *16 (D. Utah Sept. 27, 2022) (finding that the insurer's "choice of January 4, 2018, as the cut-off date for coverage appears arbitrary . . . [because] [t]here was nothing significant about January 4 other than it being the 30-day mark to D.B.'s start of residential care.  The only recorded event on January 4 was a shift log.").

19. Plaintiff has also established, by a preponderance of the evidence, that the care A.C. received at CALO was "in accordance with the generally accepted standards of medical practice"

---

[11] AR 1330, 1329, 1328, 1327, 1314, 1309, 1307, 2100, 3877, 3782; *cf.* AR 1724 (InterQual guidelines: "aggressive or assaultive behavior").

[12] AR 394, 393, 2892, 2769, 121, 1608, 1607, 1593, 1590, 1589, 1580, 1570, 1566, 1565, 1545, 1543, 1542, 1541, 1540, 1518, 1516, 1515, 5746, 1480, 2473, 5721, 2468, 1458, 1455, 1439, 1432, 1429, 1428, 1412, 1411, 1398, 1396, 5667, 1348, 1347, 1292, 1278, 2242, 2096, 2085, 2083, 4212, 4211, 4206, 4188, 4169, 4165, 4154, 4145, 4142, 4140, 4139, 4128, 4125, 4066, 4063, 4034, 4033, 4018, 4013, 3958, 3953, 3952, 3941, 3939, 3933, 3855, 3735, 3733, 3731.

[13] AR 1372, 1359, 1351, 3877; *cf.* AR 1724–25 (InterQual guidelines: "unable or unwilling to follow instructions . . . unresponsive to staff directions or limits")

[14] AR 4677, 4679, 2892, 264, 2771, 124, 5670, 1291, 2133, 2096, 4209, 4185, 3568, 3918, 3893, 3874, 3782, 3689, 3858, 3848, 3805, 3747, 3708, 3689.

[15] Even if A.C.'s symptoms had shown a marked improvement while at CALO, his treatment could still have been medically necessary.  In *Wiwel v. IBM Med. & Dental Ben. Plans for Regular Full-Time & Part-Time Emps.,* No. 5:15-cv-504-FL, 2018 WL 526988 (E.D.N.C. Jan. 18, 2018), the court concluded the insurer's denial of benefits was erroneous (even under the more stringent abuse of discretion standard) because the insurer's reviewers had failed to evaluate whether improvements in the patient's depression would last if she was removed from residential treatment.  *See also Charles W. v. Regence BlueCross BlueShield of Oregon*, No. 2:17-CV-00824-TC, 2019 WL 4736932, at *9 (D. Utah Sept. 27, 2019) ("Because Regence's reviewers did not appropriately consider the extent to which Zoe's stability was attributable to New Haven or explain why it would not get worse if she left New Haven, Plaintiffs have demonstrated by a preponderance of the evidence that Zoe's treatment at New Haven was medically necessary").  In finding that A.C.'s treatment at CALO after June 26, 2019 was not medically necessary, Premera offered no reasons to conclude that removing A.C. from the care of CALO would not have resulted in a regression of his symptoms.

and clinically appropriate, given his diagnoses.  *See* AR 5949.  At the time of A.C.'s treatment at CALO, he was diagnosed with major depressive disorder (MDD), attention-deficit hyperactivity disorder (ADHD), reactive attachment disorder (RAD), and post-traumatic stress disorder (PTSD).  *See, e.g.*, AR 4926.

20. During the pre-litigation process, Plaintiff emphasized that A.C.'s diagnostic profile is complex and requires specialized treatment to address his symptoms and underlying issues.  AR 20.  She pointed specifically to the AACAP RAD Practice Parameter (available at https://tinyurl.com/bdhcf8h3), which she wrote, "summarizes the clinical best practices and appropriate interventions for patients struggling with RAD."  *Id.*  Plaintiff again referenced the AACAP standards in her summary judgment motion, this time pointing also to the Principles of Care (available at https://tinyurl.com/39w939j3).  Dkt. # 53 at 19–20.

21. Premera's denial letters and summary judgment briefing do not address the RAD Practice Parameter.  AR 1801, 4249; Dkts. ## 48, 59, 64, 69.  Premera's opposition to Plaintiff's motion for summary judgment addresses the Principles of Care but does not argue that they are not "based on credible scientific evidence published in peer reviewed medical literature generally recognized by the relevant medical community, physician specialty society recommendations and the views of physicians practicing in relevant clinical areas and any other relevant factors."  *See* AR 5949.  It argued only that the AACAP standards do not "establish a policy or standards for determining when residential treatment is medically necessary."  Dkt. # 59 at 6.[16]  But as the Court has explained, it consults these documents—along with other record evidence—only to

---

[16] Premera also did not object to the AACAP standards on the ground that they fall outside the administrative record.  The Court concludes that consulting these standards does not require going outside the record, as the AACAP standards were raised in the pre-litigation appeal and both documents are in the public record.  But also, Premera conceded at oral argument that the Court may look outside the administrative record in defining "generally accepted standards of medical practice."  *See* Dkt. # 68 at 18.

help define "generally accepted standards of medical practice," not medical necessity as a whole (which is otherwise defined adequately by the plan language).[17]

22. The AACAP RAD Practice Parameter explains that there are two basic psychotherapeutic modalities to help children with RAD and their caregivers attune to each other and interact more positively: working through the caregiver and working with the caregiver-child dyad (or family) together.[18]   The second modality, dyadic therapy, was provided to A.C., his mother N.C., and his sister K.C. at CALO about weekly.   *See, e.g.*, AR 4874 (noting the use of "dyadic developmental psychotherapy" during weekly family therapy sessions).   A.C.'s treatment plans and medical records also reflect multiple other treatment modalities used to address his mental health needs including individual therapy, group therapy, alpha stim therapy, canine therapy, and milieu therapy.   *See generally* AR.   Defendant makes no arguments that these treatment modalities were not clinically appropriate for A.C., given his diagnostic profile.   *See generally* Dkts. ## 48, 59, 64, 69; *cf. Andrew C. v. Oracle Am. Inc. Flexible Benefit Plan*, 474 F. Supp. 3d 1066, 1082 (N.D. Cal. 2020) (where the court chose to rely on guidelines that were more specifically tailored to Plaintiff's diagnostic profile than those mainly referenced by Defendant).[19]

---

[17] Premera also notes that the plaintiff in *Todd R v. Premera Blue Cross Blue Shield of Alaska,* No. C17-1041JLR, 2021 WL 2911121, at *10 (W.D. Wash. July 12, 2021), advocated for the application of the AACAP Principles and the court rejected the argument.   But *Todd R* is distinguishable from this case because there, the court found that the Milliman Care Guidelines were incorporated into Premera's medical policy.   *Id.* at *14.   Therefore, the court would have been justified in deviating from the guidelines only if they did not track the generally accepted standards of care.   Here, the parties agree that the InterQual guidelines are not incorporated into the Plan and therefore the Court may consult other record evidence in defining ambiguous Plan terms.

[18] Practice Parameters, Principles, Guidelines and Resource Centers, AACAP, available at https://tinyurl.com/bdhcf8h3; *see also* AR 940.

[19] Defendant argues that *Andrew C.* is no longer good law because the court there relied on the since-overruled *Wit* district court opinion.   *See* Dkt. # 69 at 4 ("[*Andrew C*] rejected the guidelines that United Healthcare used to determine medical necessity.   Citing the district court's (now overruled) opinion in Wit, [it stated] that United's 'Optum Guidelines are not consistent with any generally accepted standards of medical practice' with no further analysis").   But Defendant misstates the holding of the case.   In fact, the court in *Andrew C* did not reach whether the Optum Guidelines tracked generally

23. Indeed, A.C.'s medical records from CALO establish, by a preponderance of the evidence, that his treatment was both clinically appropriate and adhered to the generally accepted standards of care. A.C.'s treatment team was comprised of various mental health professionals with graduate level training. *See, e.g.*, AR 677, 4874, 2830, 4543 (family and individual therapy facilitated by Angie Doden, P.L.P.C. and Chris Austin, M.A., L.P.C., N.C.C.); 614, 4553 (group therapy facilitated by Chris Austin M.A., L.P.C., N.C.C., Sarah Barlett, L.C.S.W.); 642, 1447 (medication management and psychiatric examinations by Maria Bernabe, M.D. and Jyotsna Nair, M.D.); *see* AACAP Principles of Care at 2. A.C. met with a psychiatrist—typically Dr. Nair—weekly for medication management and a psychiatric examination. *Id.; see, e.g.*, AR 472, 446, 2975, 406, 384 (visits with Dr. Nair in August 2019); *see also* AR 1724–25 (InterQual guidelines). CALO provided A.C. with mental health care, physical health care, and education. *See, e.g.*, AR 426; *see also* AACAP Principles of Care at 3. A.C.'s treatment team created monthly Treatment Plans (the first of which was drafted on the date of his admission) that include DSM diagnoses, short-term and long-term goals with estimated dates of completion, medication monitoring, planned interventions, and discharge planning. *See, e.g.*, AR 426; *see also* AACAP Principles of Care at 4–5; AR 1724–25 (InterQual guidelines).

24. Lastly, Plaintiff has established, by the preponderance of the evidence, that the treatment A.C. received at CALO was not "primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment

---

accepted medical standards, and instead found that Plaintiff was entitled to benefits even under the guidelines. *Andrew C.*, 474 F. Supp. 3d at 1981 ("[T]he Court need not reach the question of whether UHC used the Guidelines improperly to deny benefits since the Court finds Andrew was entitled to benefits for the period in dispute even under those Guidelines."). It therefore remains good law despite the Ninth Circuit's decision in *Wit.*

of that patient's illness, injury or disease." AR 5949.[20]  Based on A.C.'s diagnostic and

treatment history, the Court concludes that any lower level of care would not have safely

managed his symptoms.

25. Before A.C.'s admission to CALO, his mental health conditions and behaviors had

escalated to the point where less intensive levels of care were not keeping him and his family

safe.  He had engaged in several years of counseling without success; the record shows that his

providers could not make effective interventions and that A.C. refused to comply with treatment.

*See, e.g.,* 771.  The record also shows that A.C. was prescribed many medications to treat his

symptoms over the years, also with limited success.  AR 994, 1006, 4943.  He continued to

display dangerous symptoms such as physical and verbal aggression, suicidal thoughts, *id*, AR

1008, hypervigilance, severe anxiety, and depression.  *See, e.g.,* AR 1008.  On at least two

separate occasions, the police were called (once by A.C. himself because he did not feel safe and

once by N.C. after he became physically aggressive with her) and he was hospitalized.  *See* AR

981–991, 1005–1006.  A.C.'s most recent hospitalization immediately preceded his admission to

a community-based acute treatment (CBAT) program at Franciscan Children's Hospital, AR

1012–1019, which then led to his admission to a therapeutic wilderness program (New Vision),

AR 1022–1026, so that he could "stabiliz[e]" before enrolling in CALO.  *Id.*  A.C.'s admissions

paperwork at CBAT, New Vision, and CALO document a history of depression, anxiety, suicidal

---

[20] Although the Court finds this definition to be unambiguous, it notes that the AACAP Principles
of Care articulate an analogous standard:

> When the treating clinician has considered less restrictive resources and determined that
> they are either unavailable or not appropriate for the patient's needs, it might be
> necessary for a child or adolescent to receive treatment in a psychiatric residential
> treatment center (RTC).  In other cases the patient may have already received services in
> a less restrictive setting and they have not been successful.

AACAP Principles of Care at 1.

ideation, and verbal aggression escalating to physical aggression.  AR 1014–1015, 1022–1026, 4939–4940, 4926.[21]

26. Because lower levels of care had not been effective in safely managing A.C.'s symptoms, and the fact that his providers had considered alternate courses of treatment but determined that he required the stability and structure of a residential treatment program, the Court concludes that his stay at CALO was "not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least likely to produce equivalent therapeutic or diagnostic results . . ."  AR 5949.  *Cf.* AR 4926 ("[A.C.] knows that he needs to address his trauma, but wishes he could do it at home, in outpatient treatment, rather than in Residential Treatment.").

27. Thus, Plaintiff has shown by a preponderance of the evidence that A.C.'s treatment at CALO was medically necessary under the Plan.  He is therefore entitled to coverage.

      **B.**      **Plaintiff's Claim for Equitable Relief under 29 U.S.C. § 1132(a)(3)**

Because the Court awards benefits to Plaintiff under 29 U.S.C. § 1132(a)(1)(B), it concludes that equitable relief under 29 U.S.C. § 1132(a)(3) would be inappropriate.  *See Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996) ("where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief"); *Moyle*, 823 F.3d at 961 (reading *Varity* to prohibit duplicate recoveries under § 1132(a)(1)(B) and § 1132(a)(3)); *Lefler v. United Healthcare of Utah, Inc.*, 72 F. App'x 818, 826 (10th Cir. 2003). The Court therefore dismisses Plaintiff's Parity Act claim.

---

[21] The Court also notes that A.C.'s complex mental health history and diagnostic profile is compounded by his adoption at a young age (which apparently resulted in feelings of abandonment and attachment issues), sexual abuse by a family friend over several years when he was a young child, and exposure to his sister's violent tantrums and conflicts with his mother.  The record also shows that A.C.'s sister was both a victim and a perpetrator of sexual abuse, *see, e.g.*, AR 1014, which understandably made A.C.'s home at times feel like an unsafe environment.

## IV

### CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's motion in part and awards judgment for Plaintiff on her claim for denial of benefits under 29 U.S.C. § 1132(a)(1)(B).   The Court otherwise DENIES the motions.

The parties shall, within thirty (30) days of the date of this Order: (1) meet and confer to resolve the amount of unpaid benefits due, and (2) submit a proposed judgment consistent with the terms of this Order.

This terminates Docket Nos. 48 and 53.

Dated this 31st day of March, 2023.


John H. Chun
United States District Judge